# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER

| | |
|---|---|
| _____ ) | |
| MTD PRODUCTS INC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **Court No. 21-00264** |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant ) | |
| ) | |
| and ) | |
| ) | |
| BRIGGS & STRATTON, LLC, ) | |
| ) | |
| Defendant-Intervenors ) | |
| ) | |
| _____ ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

# <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ................................................................................ 1

II. RULE 56.2 STATEMENT ................................................................. 1

    A. Administrative Decision Under Review ................................. 1

    B. Issues Presented and Summary of Argument ...................... 2

III. PROCEDURAL BACKGROUND AND STATEMENT OF FACTS ................................................................................................ 3

IV. STANDARD OF REVIEW ................................................................ 6

V. THE ITC'S AFFIRMATIVE CRITICAL CIRCUMSTANCES DETERMINATION WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND INCONSISTENT WITH THE LAW ........................................................................................... 7

    A. The Legal Standard for an Affirmative Critical Circumstances Determination ................................................ 7

    B. The ITC Based its Finding on Unrepresentative and Distorted Data ....................................................................... 10

    C. The Remedial Effects of the Orders Are Not Seriously Undermined ........................................................................... 20

VI. CONCLUSION ................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx, Inc. v. United States,*
370 F.3d 1108 (Fed. Cir. 2004) ............................................................. 6

*Certain Preserved Mushrooms from China, India, and Indonesia,*
Inv. Nos. 731-TA-777-779 (Final), USITC Pub. 3159, at 27-28 (Feb. 1999) ................................................................. 9, 16, 22

*CS Wind Vietnam Co. v. United States,*
832 F.3d 1367 (Fed. Cir. 2016) ............................................................. 6

*Honey from Argentina and China,*
Inv. Nos. 701-TA-402 ................................................................. 9, 10, 22

*Large Vertical Shaft Engines from China*
*: Investigation Nos. 701-TA-637 ........................................ 16, 17, 18, 19

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .................................................................. 6

*MTD Products Inc v. United States,*
Ct. No. 21-00264 (Ct. Int'l Trade May 28, 2021) .............................. 1, 6

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) ............................................................. 7

*Shanghai Foreign Trade Enters. Co. v. United States,*
318 F.Supp.2d 1339 (CIT 2004) ............................................................. 6

*Small Vertical Shaft Engines from China,*
85 FR 27243 (May 7, 2020) .................................................................. 4

*Yantai Oriental Juice Co. v. United States,*
26 CIT 605 (2002) .................................................................. 7

**Statutes**

19 U.S.C.
    § 1516a(b)(l)(B)(i) ................................................................ 6
    §§ 1671d(b)(4)(A) ............................................................... 20
    §§ 1671d(b)(4)(A) and 1673d(b)(4)(A) ......................... 2, 3, 27
    § 1673d(b)(4)(A)(i) ......................................................... 8, 11

Tariff Act of 1930 Section 735(b)(4)(A) .................................... 8

Uruguay Round Agreements Act, H.R. Rep. No. 103-316
    (1994) ................................................................................ 9

# GLOSSARY

| Abbreviation | Term |
|---|---|
| MTD/Plaintiff | MTD Products Inc |
| Pla. Mot. | Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record |
| ITC/Commission | U.S. International Trade Commission |
| Pla. Com. | Complaint, *MTD Products Inc v. United States*, Ct. No. 21-00264 (Ct. Int'l Trade May 28, 2021) (ECF No. 4) |
| The *Orders* | *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof From the People's Republic of China: Antidumping and Countervailing Duty Orders,* 86 Fed. Reg. 23675 (May 4, 2021) |
| AD/CVD | Antidumping and Countervailing Duty |
| Briggs & Stratton/Petitioner | Briggs & Stratton Corporation |
| SVSEs | Small Vertical Shaft Engines |
| Commerce | U.S. Department of Commerce |
| CCV | Confidential Commission Views |
| CR/PR | Confidential Report INV-TT-044 (March 25, 2021)/Public Report |
| Br. | Brief |
| Tr. | Transcript |
| CJV | Commissioner Johanson's Views |

## I.   <u>INTRODUCTION</u>

Plaintiff MTD Products Inc ("MTD" or "Plaintiff") respectfully requests that the Court grant Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record ("Pla. Mot.") in this action. MTD has standing and the Court has the requisite subject matter jurisdiction over MTD's claim.

## II.   <u>RULE 56.2 STATEMENT</u>

### A.   **Administrative Decision Under Review**

In this action, Plaintiff challenges the U.S. International Trade Commission's ("ITC" or "Commission") affirmative determination of critical circumstances, described herein, as implemented in the antidumping and countervailing duty orders on certain small vertical shaft engines from the People's Republic of China. *See* Complaint, *MTD Products Inc v. United States*, Ct. No. 21-00264 (Ct. Int'l Trade May 28, 2021) (ECF No. 4) ("Pla. Com."); *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof From the People's Republic of China: Antidumping and Countervailing Duty Orders,* 86 Fed. Reg. 23675 (May 4, 2021) (the *Orders); see also Small Vertical Shaft Engines From China,* 86 Fed. Reg. 22975 (Apr. 30, 2021). Specifically, MTD challenges the Commission's factual findings and the legal conclusions on which ITC

based its affirmative determination of critical circumstances. *See* Pla. Com. at 4.

**B.    Issues Presented and Summary of Argument**

**Whether the ITC's affirmative determination with respect to critical circumstances was supported by substantial evidence and consistent with the law?**

No. The data relied upon for the Commission's affirmative critical circumstances determination does not support a finding that imports in fact increased by such a magnitude that they undermine seriously the remedial effect of the *Orders* under 19 U.S.C. §§ 1671d(b)(4)(A) and 1673d(b)(4)(A). Specifically, the Commission based its critical circumstances determination on faulty assumptions and inaccurate, incongruous proxy data, while disregarding the extraordinary circumstances occasioned by the COVID-19 pandemic. These factors resulted in an apparent, though distorted, increase in volume in the post-petition period.

Additionally, the Commission failed to fully consider other factors or "circumstances indicating that the remedial effect of the {*Orders*} will be seriously undermined," as required by 19 U.S.C. §§ 1671d(b)(4)(A) and 1673d(b)(4)(A). These considerations include the facts that (1) gasoline

engines for outdoor power equipment are non-fungible custom products with extraordinarily long lead times, (2) MTD's inventory from purchases of these engines during the post-petition period was substantially exhausted prior to imposition of the *Orders*, and (3) record evidence demonstrates that the domestic industry was already benefiting substantially from the effects of the *Orders* after provisional measures were imposed and continued to do so following the imposition of the *Orders*. Therefore, the record evidence does not meet the high standard necessary to demonstrate that the imports at issue meaningfully weakened or subverted the effects of the *Orders*.

## III.   PROCEDURAL BACKGROUND AND STATEMENT OF FACTS

This case involves the antidumping duty ("AD") order and countervailing duty ("CVD") order on small vertical shaft engines from China issued in connection with case nos. A-570-124/731-TA-1493 and C-570-125/701-TA-643, respectively. On March 18, 2020, Briggs & Stratton Corporation ("Briggs & Stratton" or "Petitioner"), a U.S. producer of small vertical shaft engines ("SVSEs") filed the petitions in these investigations. MTD Products Inc ("MTD"), a U.S. producer of outdoor power equipment, participated in each segment of these investigations as

3

an importer of the subject merchandise. On May 7, 2020, the Commission determined that there was a reasonable indication that the domestic industry is materially injured by reason of imports of SVSEs from China. *See Small Vertical Shaft Engines from China*, 85 FR 27243 (May 7, 2020). On August 24, 2020, the Department of Commerce ("Commerce") imposed countervailing duties on SVSEs from China. *See Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof, From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 Fed. Reg. 52086 (Aug. 24 2020) (*Preliminary Countervailing Duty Determination*). On October 21, 2020, Commerce imposed antidumping duties on SVSEs from China and made an affirmative determination of critical circumstances. *See Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof, from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, and Preliminary Affirmative Determination of Critical Circumstances, in Part*, 85 Fed. Reg. 66932 (Oct. 21, 2020).

On April 30, 2021, the Commission made determinations that an industry in the United States is materially injured by reason of imports of SVSEs from China sold in the United States at less than fair value and subsidized by the government of China. *Small Vertical Shaft Engines from China*, 86 Fed. Reg. 22975 (Apr. 30, 2021). The Commission also made an affirmative determination of critical circumstances, finding that "imports subject to the Department's affirmative critical circumstances determinations are likely to undermine seriously the remedial effect of the AD and CVD orders on small vertical shaft engines from China and, as a result, certain imports from China will be subject to retroactively imposed antidumping duties and countervailing duties." *Id. See also Antidumping and Countervailing Duty Orders*, 86 Fed. Reg. at 23675-76.

On May 4, 2021, the Department issued the *Orders* confirming the retroactive imposition of duties on entries of subject merchandise imported between July 23, 2020 and (up to and including) October 20, 2020 (A-570-124) and between May 26, 2020 and (up to and including) August 23, 2020 (C-570-125), *i.e.*, 90 days prior to the Department's preliminary determinations issued on October 21, 2020, and August 24, 2020, respectively.

MTD commenced this proceeding on March 27, 2021. *See* Summons, *MTD Products Inc v. United States*, Ct. No. 21-00264 (Ct. Int'l Trade May 27, 2021) (ECF No. 1).

## IV.  STANDARD OF REVIEW

The Court holds unlawful any determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(l)(B)(i). Substantial evidence is "more than a mere scintilla" of supportive record information. *Altx, Inc. v. United States,* 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The standard of review requires the agency to fully consider "whatever in the record fairly detracts" from the evidence adduced in support of the agency's conclusion, *CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1373 (Fed. Cir. 2016), and to analyze all "important aspect{s} of the problem" before it. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Additionally, an agency must do more than offer conclusory statements of its findings. *See, e.g., Shanghai Foreign Trade Enters. Co. v. United States,* 318 F.Supp.2d 1339, 1346 (CIT 2004); *Yantai Oriental Juice Co. v. United States,* 26 CIT 605, 611

(2002). Furthermore, an agency's decision is only supported by substantial record evidence if it is reasonable. *See Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1351 (Fed. Cir. 2006).

## V. THE ITC'S AFFIRMATIVE CRITICAL CIRCUMSTANCES DETERMINATION WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND INCONSISTENT WITH THE LAW

The Commission erred by finding critical circumstances exist with respect to imports of the subject merchandise, because the record demonstrates: (1) the Commission based its determination upon inaccurate, unrepresentative, and incongruous comparison period data; and (2) the apparent increase in volume in the post-petition period had no deleterious effects on the domestic industry, much less on the going-forward efficacy of the *Orders*. As such, the Commission's final affirmative determination with respect to critical circumstances is unsupported by substantial evidence and otherwise inconsistent with the law.

### A. The Legal Standard for an Affirmative Critical Circumstances Determination

Section 735(b)(4)(A) of the Tariff Act of 1930, as amended, provides that in assessing critical circumstances, the Commission must determine "whether the imports subject to {Commerce's} affirmative determination

of {critical circumstances} are likely to undermine seriously the remedial effect of the antidumping duty order to be issued . . ." 19 U.S.C. § 1673d(b)(4)(A)(i). The Commission has consistently interpreted the statutory language as setting forth a very high standard and as a result, affirmative findings are exceedingly rare. This consistent Commission practice reflects the fact that the retroactive application of duties is an extraordinary measure under U.S. law.

The statute provides that, in making this determination, the Commission shall examine, among other factors it considers relevant:

(i)     The timing and volume of the imports;

(ii)    a rapid increase in inventories of the imports; and

(iii)   any other circumstances indicating that the remedial effect of the antidumping order will be seriously undermined.

§ 1673d(b)(4)(A)(ii).

The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act indicates further that the Commission is to assess "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order" and specifically "whether the surge in

8

imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order."  The SAA to the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 877 (1994). The Commission has explained that the "undermines seriously" test establishes a very high standard:

> {T}he plain meaning of the term 'undermines seriously establishes a very high standard: that the surge in imports greatly and insidiously weakens or subverts the effects of the order.

*Certain Preserved Mushrooms from China, India, and Indonesia*, Inv. Nos. 731-TA-777-779 (Final), USITC Pub. 3159, at 27-28 (Feb. 1999) (views of Chairman Bragg, Commissioner Crawford, and Commissioner Askey) (*Certain Preserved Mushrooms*).

In applying this very high standard, the Commission nearly always reaches a negative determination of critical circumstances, as it has in every final injury determination since November 2001. *See Honey from Argentina and China*, Inv. Nos. 701-TA-402 and 731-TA-892-893 (Final), USITC Pub. 3470, at 22-24 (Nov. 2001) (*Honey*). In the few cases where Commerce has issued affirmative critical circumstances determinations, the Commission found extraordinarily massive surges in import levels. In *Potassium Permanganate*, the Commission found critical

9

circumstances existed where subject imports increased by more than 650 percent in the post-petition period. Inv. No. 731-TA-125 (Final), USITC Pub. 1480, at 13 (Jan. 1984) (*Potassium Permanganate*). In *Synthetic Indigo*, the Commission found critical circumstances existed where subject imports surged more than 300 percent in the post-petition period. Inv. No. 731-TA-851 (Final), USITC Pub. 3320, at 15 (June 2000) (*Synthetic Indigo*).

### B.   The ITC Based its Finding on Unrepresentative and Distorted Data

The Commission's critical circumstances analysis in this case is rife with apples-to-oranges comparisons and faulty assumptions based on unrepresentative data. Specifically, the Commission based its determination on export data subject to significant lead times, incongruous and inaccurate comparison periods, and artificial apparent increases in volume due in large part to the COVID-19 pandemic. The Commission failed to fully consider these issues in its analysis, and in any case, failed to sufficiently explain how these issues impacted the timing and volume of apparent imports, the first statutory criterion under critical circumstances analyses. § 1673d(b)(4)(A)(ii). Therefore, the

Commission's affirmative critical circumstances finding is not supported by substantial evidence and inconsistent with the law.

As an initial matter, the Commission relied on shorter five-month comparison periods because Commerce's initial preliminary determination fell within the six-month post-petition period the Commission typically considers (*i.e.*, August 24, 2020). *See* Confidential Commission Views ("CCV") at 59. Additionally, because the petitions were filed "towards the middle of the month (on March 18, 2020)," the Commission included March in the pre-petition period. *Id.* at 59, n. 241. Therefore, the Commission used the entirety of volume data for the months November 2019-March 2020 as the "pre-petition" period and that for April 2020-August 2020 as the "post-petition" period. *Id.* at 59-60. This resulted in 12 days' worth of data wrongly included in the "pre-petition" comparison period, and 7 days incorrectly included in the "post-petition" period. It is unclear exactly how much of the volume data for each these two months fall within these erroneously included periods. Nonetheless, the comparison periods reviewed by the Commission incorrectly include nearly three weeks of volume data. This is just the

first of many inaccuracies in the Commission's critical circumstances analysis.

The Commission further stated at the outset that "{w}e have therefore compared the volume of subject imports subject to Commerce's affirmative critical circumstances determinations…" but later noted that, because the record apparently did not contain data for subject imports specific to Commerce's findings for the relevant comparison periods, the Commission in fact relied only on export data in making its determination. *Id*. at 59-60. When MTD highlighted the fact that a comparison of this export data would not account for the demonstrated 90- to 120 day lead times applicable to exports of the subject merchandise, the Commission merely stated "…this argument is inapposite… {o}ur critical circumstances data are based on monthly exports to the United States reported by the Zongshen Companies, not on monthly U.S. imports, and therefore do not reflect shipment times … on which the lead times are based." *Id*. at 63, n. 256; *see also* Final Hearing Transcript ("Tr.") at 303, 307 (Griffin).  However, this is precisely the issue MTD attempted to flag for the Commission. Yet, the

Commission failed to provide a rational explanation as to why this issue was "inapposite," only restating the problem.

Specifically, the Commission seemingly failed to grasp why a finding of this nature based not on import data at all but <u>export</u> data – export data which is subject to lead times of three-to-four months – might be problematic. For example, as noted, the provisional measures were first imposed on August 24, 2020. *See Preliminary Countervailing Duty Determination*, 85 Fed. Reg. at 52088. Therefore, accounting for the lead times, a substantial portion of the exports used as a proxy for import data in this analysis would have itself been subject to duties pursuant to provisional measures, and later, the *Orders*, upon entry.  This is contrary to the statutory standard applicable to this analysis, *i.e.*, "whether, by massively increasing imports <u>prior to the effective date of relief</u>, the importers have seriously undermined the remedial effect of the order" and specifically "whether the surge in imports <u>prior to the suspension of liquidation</u>, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order."  The SAA, H.R. Rep. No. 103-316, at 877. If the Commission had fully considered these lead times, which as the record demonstrates, are based in part on

"shipment times," the Commission would have realized that the export data for at least the months of August and July (and in this case, earlier) would all likely reflect imports ultimately subject to provisional measures. Confidential Report INV-TT-044 (March 25, 2021) ("CR")/Public Report ("PR") at II-17-18. This is clearly contrary to the statutory directive to analyze "the surge in imports prior to the suspension of liquidation." SAA at 877. Analyzing export data representing imports which entered after provisional measures were imposed is not at all representative of imports entered prior to the suspension of liquidation.

Further, the Commission expressly noted that "{m}onthly exports subject to Commerce's affirmative critical circumstances determination in the antidumping duty investigation were at … their highest levels of the POI from April to July 2020." *See* CCV at 62. Again, due to lead times, compounded in this case by production shutdowns from January to March 2020 caused by COVID-19, it is likely that a substantial portion of the exports reflected in this period would have been ordered prior to the filing of the petitions. Indeed, it is precisely during this period when Chinese manufacturers re-started manufacturing operations and began

fulfilling a backlog of orders. This backlog of orders, made prior to the filing of the Petition, would have accounted for the substantial majority of exports during the April to July 2020 period. The Commission ignores this fact by stating generally that exports in January 2020 through March 2020 appeared higher than in the same period in 2019, and therefore, "those shutdowns did not appear to affect {the Zongshen Companies'} exports to the United States." *Id*. at 63. This assumption in fact forms the only basis on which the Commission rests its conclusion that COVID-19 shutdowns and related fulfillment backlogs made no impact on the apparent increase of exports from China during the months of April 2020 through July 2020.

However, this assumption considered in a vacuum ignores commercial realities unique to each selling year, including supply constraints and demand elasticity, logistical considerations, and production capacities, in addition to numerous extraneous economic factors impacting the year-over-year U.S.-China trade environment during this period, which itself has been characterized by increased volatility and uncertainty. *See* CR/PR at Pt. II ("Conditions of competition in the U.S. market"). The record clearly demonstrates that both

production and shipment lead times varied more widely during the post-petition period due to factory shut-downs and substantial port and supply chain disruptions caused by the COVID-19 pandemic. *See* CCV at 59, n. 241; CR/PR at II-17-18. The Commission failed to consider any of this in its conclusion that Chinese manufacturers of subject engines were not impacted by the COVID-19 pandemic, and these shutdowns, transportation disruptions, and related issues did not impact the data on which the Commission relied for its critical circumstances finding.

In previous cases, the Commission has appropriately found it necessary to consider, among other factors, relevant lead times and the fungible nature of the subject merchandise, making negative critical circumstances determinations where the available data likely represented entries "ordered…in advance of the petition being filed." *Utility Scale Wind Towers from Canada, Indonesia, Korea, and Vietnam* Investigation Nos. 701-TA- 627-629 and 731-TA-1458-1461 (Final) USITC Publication 5101 (August 2020) (*Wind Towers*) at 50. For example, in *Large Vertical Shaft Engines,* a case substantially related to this proceeding, the Commission made negative findings of critical circumstances because, "given the lead times from China, portions of the

16

post-petition import volumes were ordered before the petition was filed." *Large Vertical Shaft Engines from China:* Investigation Nos. 701-TA-637 and 731-TA-1471 (Final) Publication 5162 (February 2021) (*Large Vertical Shaft Engines*), at 54-55. In this case, however, the Commission failed to fully consider the applicable lead times in making its critical circumstances determination.

The inventory data on which the Commission based its analysis in this case is similarly distorted. Again, the Commission notes that "{a}vailable inventory data do not correspond precisely to the comparison periods," and therefore the Commission relied on end of 2019 inventories (*i.e.*, December 2019) for pre-petition purposes as compared to end of September 2020 inventories for the post-petition period. *See* CCV at 62. Not only are the December 2019 inventories relied upon a full three months prior to the filing of the petition, but this comparison necessarily fails to account for the seasonality with respect to sales of subject engines. *Id.* Indeed, in addition to ignoring the clear issues with comparing inventories across two completely different selling seasons, in two very different commercial climates, as will be explained more fully below, the Commission also brushed aside record evidence demonstrating that MTD

had drawn down most of its import inventory prior to the imposition of the *Orders* – conclusive evidence demonstrating that imports during the comparison period could not have possibly seriously undermined the remedial effect of the *Orders*.

MTD similarly highlighted the significant and extraordinary issues with respect to the data relied upon for the 2020 year, specifically caused by the COVID-19 pandemic. The record demonstrates that the increase in apparent imports over the post-petition period was largely due to an increase in domestic demand during U.S. COVID-19 shutdowns, coinciding with, as mentioned, Chinese exporters coming back online post COVID-19 shutdowns of their own to fulfill a backlog of U.S. orders largely made prior to this period. Moreover, these extraordinary social circumstances coincided with reported commercial uncertainties surrounding the domestic industry's ability to meet ongoing demand unrelated to the COVID pandemic, namely, Briggs & Stratton's widely anticipated bankruptcy. *Id.* at 62-63, n. 253. Despite failing to seriously contemplate the extent to which these unique circumstances distorted the already inaccurate and erroneous data relied upon for its critical circumstances finding, the Commission stated only that this information

"further supports that the effect of these imports is to undermine seriously the remedial effect of the *Orders*." *Id.* at 63, n. 253. This is directly contrary to record evidence demonstrating that the Zongshen Companies experienced prolonged production shutdowns from late January through March, increased U.S. demand during the post-petition period, and Briggs & Stratton's apparent difficulties in meeting demand during this period. CR/PR at Table VII-3; MTD's importer questionnaire at Question II-2b, EDIS Doc. No. 728011; MTD's Prehearing Brief ("Br.") at 44 and 57, Exhibit 6 at 10. Contrary to the law, the Commission failed to sufficiently articulate how these considerations "further support" its findings.

Therefore, as demonstrated, the Commission's affirmative critical circumstances determination is not supported by substantial evidence. Specifically, the Commission based its determination on a deficient and distorted analysis which failed to fully consider numerous extraordinary circumstances impacting both the timing and volume of imports, and import inventories, over the post-petition period. Thus, the Commission's affirmative critical circumstances determination is not in accordance with the law.

## C. The Remedial Effects of the Orders Are Not Seriously Undermined

The purpose of the critical circumstances provision is to ensure that imports during the period after a petition is filed but before the imposition of provisional measures do not enter in so great a volume as to seriously undermine the going-forward efficacy of an antidumping and/or countervailing duty order. *See* 19 U.S.C. §§ 1671d(b)(4)(A); 1673d(b)(4)(A). The standard for such a finding is a high one – the mere fact that post-petition imports increase is not, in and of itself, an indication that a critical circumstances finding is appropriate. Rather, the increase must have the effect of seriously undermining the eventual orders. For example, if importers bring in so much subject merchandise in the wake of a petition that they can simply sell it out of inventory for the foreseeable future, then the eventual orders become a nullity and as such are seriously undermined. In such a situation a critical circumstances determination may be appropriate… But the record in the instant case showed nothing of the sort.

Specifically, the record demonstrates that the merchandise subject to this analysis are custom-made, non-fungible products which were not stockpiled – either for resale on the merchant market or for internal

consumption. Further, MTD had drawn down most of its import inventory from the post-petition period – custom-made for MTD's manufactured outdoor power equipment – by the fourth quarter of 2020, which contravenes any alleged inventory overhang which might impact MTD's future supply needs. The record further demonstrates that imports significantly subsided immediately following the imposition of provisional measures, while MTD entered into new supply agreements with Petitioner that included significant price increases, despite Petitioner's demonstrated inability to consistently meet demand. *See* MTD Prehearing Br. at 45 & 56; MTD's Posthearing Br. at 10. Therefore, the record demonstrates that the remedial effects of the *Orders* were not, in fact, seriously undermined by the apparent increase in imports over the post-petition period.

First, the Commission based its finding with respect to the share of U.S. consumption of imports on import shipments vis-à-vis total U.S. shipments. *See* CCV at 61 and n. 248. However, the Commission ignored the fact that MTD could not possibly account for any import shipments as defined by the Commission, because the engines imported by MTD were custom-made specifically for MTD-manufactured outdoor power

equipment, and thus, these engines are not and cannot be resold on the merchant market. *Id*. at 58 and n. 239. In fact, the fungible nature of the merchandise at issue and its ability to be stockpiled for resale has factored into every other affirmative critical circumstances determination made by the ITC in the past 30 plus years. For example, in *Certain Preserved Mushrooms*, integral to the Commission's finding of critical circumstances were the facts that "mushrooms are capable of being stockpiled" and "{have} a shelf life of up to three years." *Certain Preserved Mushrooms*, USITC Pub. 3159 at 27-28, n. 137. Indeed, the Commission's prior affirmative critical circumstances decisions all involved fungible commodity products capable of stockpile and resale on the merchant market. *See Certain Preserved Mushrooms*; *Synthetic Indigo from China*; *Potassium Permanganate*; and, *Honey*.

As demonstrated, the engines subject to the critical circumstances finding in this case are not fungible commodity products, were not in fact stockpiled, and are not available for resale on the U.S. merchant market. As noted in the separate views issued by Commissioner Johanson with respect to this issue, the Commission failed to acknowledge that MTD

had nearly fully exhausted its inventory of subject engines prior to the imposition of the *Orders*:

> By the time of the Commission's hearing, MTD had drawn down most of its inventory of Chinese produced engines. Additionally, the units imported by MTD from Zongshen were built specifically for MTD's use and were not a fungible commodity that could be used by any purchaser. Taken together, the facts on the record do not indicate that the increased volume of subject imports entered in the five months after the filing of the petition (from April to August 2020) resulted in an inventory overhang that will seriously undermine the remedial effect of the order.

*See* Commissioner Johanson's Views ("CJV") at 9. Specifically, "{o}f the engines imported by MTD during the post-petition period, the organization used substantially all its inventory to accommodate increased demands through the July through November {2020}." *See* Final Hearing Tr. at 183 (Moll). Commissioner Johanson further notes the Commission's failure to fully consider the significant increase in purchases of subject engines from the domestic industry during the fourth quarter of 2020 over the same period in 2019. *See* CJV at 8. Not surprisingly, this increase in domestic purchases of subject engines coincided with a stark decrease in purchases from China in the fourth quarter of 2020 as compared to the fourth quarter of 2019. *See* MTD's Prehearing Br. at 56 and Exhibit 39.

Indeed, in the final hearing Petitioner repeatedly noted the significant salutary effects the provisional measures already provided:

> "…the situation for domestic producers actually began to improve as soon as duties were imposed to level the playing field."

Final Hearing Tr. at 9 (Orava).

> "…since these cases were filed, conditions have gotten much better for domestic producers. Volumes have increased. Prices have increased."

Final Hearing Tr. at 31 (Vaughn).

> "…in late August 2020, preliminary duties for the countervailing duty case went into effect, with preliminary antidumping duties following in October, and, for the first time in many years, we were able to compete on a level playing field… our volumes have improved, and we now see a path forward."

Final Hearing Tr. at 39-40 (Coad).

> "…since these cases were filed and preliminary duties went into effect, the domestic industry's performance has begun to improve."

Final Hearing Tr. at 319 (Vaughn).

As demonstrated, these remedial effects corresponded with new supply arrangements with Petitioner that included significant price increases, which aided in increasing domestic market share during this period. *See* MTD's Prehearing Br. at 56.

Again, these agreements were contracted during a period characterized by significant concerns surrounding the domestic industry's ability to meet MTD's demand needs. *See* MTD Posthearing Br. at 12-14. Specifically, Briggs & Stratton revealed in public filings more than six months prior to the filing of the petition that (1) it was defaulting on its loan obligations, and (2) it was closing a major production facility of subject engines. *See* MTD's Prehearing Br. at 40 and Exhibit 1, pp. 11-12 & Exhibits B & AK; CR/PR at Table III-3. MTD's perception of Briggs & Stratton's likely inability to meet 2020 demand was shared in the industry, with one equities analyst stating that Briggs & Stratton "reported one of, if not the worst quarterly results and forward guides that we can recall in our total coverage history." MTD's Prehearing Br. at Exhibit 1, pp. 25-26 & Exhibit AP. MTD's fears were justified when, in July 2020, Briggs & Stratton filed for bankruptcy, while continuing to short MTD at least 90,000 engines into the Fall 2020 selling season. CR/PR at Table III-3; MTD's Posthearing Br. at 13-14 and Exhibit 1 at 46; MTD's Prehearing Br. at Exhibit 10 (Disclosure Statement for Joint Chapter 11 Plan of Briggs & Stratton Corp. and its Affiliated Debtors, Oct. 9, 2020, Bankr. E.D. Mo.). These shortfalls

25

coincided with Briggs & Stratton's increased exports of subject engines to China to be mounted on Chinese manufactured outdoor power equipment and shipped right back to the United States to compete directly with MTD's products. *See* Final Hearing Tr. at 179-80 (Moll). Not surprisingly, this factored into MTD's short-term need to meet increased demand caused by COVID-19 during the post-petition period by importing subject engines from China. *See* Final Hearing Tr. at 183 (Moll).

Nevertheless, as Commissioner Johanson notes, "{a}s important as the import relationship with Zongshen was to MTD, MTD's relationship with Briggs & Stratton was even more so." CJV at 4. MTD has remained a loyal customer of Briggs & Stratton's engines, as demonstrated by having purchased more than three times as many engines from Briggs & Stratton than from China over the period of investigation, and its new supply arrangements including significant price increases. *See* MTD's purchaser questionnaire at Question II-4, EDIS Doc. No. 727998. This is clear evidence that the remedial effects of the *Orders* were not, in fact, undermined – much less "seriously." On the contrary, the remedial effects of the *Orders* immediately resulted in a sharp and substantial

year-over-year decrease in imports from China, significant increases in both volume and prices for the domestic industry, and a *de facto* monopoly to Briggs & Stratton for subject engines.

The Petitioner's argument was, in effect, that post-petition imports represented sales that Petitioner could have (and would like to have) made, notwithstanding that the record evidence showed that given Petitioner's production shortfalls and other commercial limitations, it could not in fact have made those sales. Regardless, Petitioner's argument misses the point – the question is whether those imports undermined the efficacy of the *Orders*, and the record is clear that they did not. Indeed, the *Orders* and the earlier provisional measures were highly effective. That is why Petitioner testified before the Commission as to the salutary effects the provisional measures were having and the need for continuation of those measures in the form.

As demonstrated, the Commission failed to fully consider these other factors in its analysis, as required by 19 U.S.C. §§ 1671d(b)(4)(A) and 1673d(b)(4)(A). Therefore, the Commission's affirmative critical circumstances determination is not supported by substantial evidence and is otherwise not in accordance with the law.

## VI.    **CONCLUSION**

For these reasons, Plaintiff respectfully requests that the Court hold that the Commission's affirmative finding of critical circumstances was unsupported by substantial evidence and otherwise not in accordance with law.

Respectfully submitted,

_____

Alex Schaefer
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500

*Counsel for MTD Products Inc*

Dated:      October 12, 2021

28

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER

_____

|  |  |  |
|---|---|---|
| **MTD PRODUCTS INC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Court No. 21-00264** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BRIGGS & STRATTON, LLC,** | ) | |
| | ) | |
| **Defendant-Intervenors** | ) | |
| | ) | |

_____)

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to U.S. Court of International Trade Rule 2(b)(2) of the Court's Standard Chambers Procedures, undersigned counsel for Plaintiff MTD, certifies this brief complies with the Court's type-volume limitation rules.  This brief contains no more than 5,630 words and therefore does not exceed 14,000 words. This brief also complies with all typeface and margin requirements.

Respectfully submitted,

_____
Alex Schaefer
Michael Bowen

*Counsel to MTD Products Inc*