# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER

| | | |
|---|---|---|
| MTD PRODUCTS INC, | ) | |
| Plaintiff, | ) | |
| | ) | Court No. 21-00264 |
| v. | ) | |
| UNITED STATES, | ) | *PUBLIC* |
| | ) | *VERSION* |
| Defendant | ) | |
| and | ) | |
| BRIGGS & STRATTON, LLC, | ) | |
| Defendant-Intervenors | ) | |
| | ) | |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

| Abbreviation | Term |
|---|---|
| MTD/Plaintiff | MTD Products Inc |
| Government/Commission/Defendant | U.S. International Trade Commission |
| Briggs & Stratton/Defendant-Intervenor | Briggs & Stratton LLC |
| SAA | Statement of Administrative Action accompanying the Uruguay Round Agreements Act |
| POI | Period of Investigation |
| The *Orders* | *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof From the People's Republic of China: Antidumping and Countervailing Duty Orders,* 86 Fed. Reg. 23675 (May 4, 2021) |
| SVSEs | Small Vertical Shaft Engines |
| Commerce | U.S. Department of Commerce |
| CCV | Confidential Commission Views |
| Final Staff Report | Confidential Report INV-TT-044 (March 25, 2021)/Public Report |
| Zongshen | Chongqing Zongshen General Power Machine Co. |
| Gov. Br. | Government's Response Brief |
| HTSUS | Harmonized Tariff System of the United States |
| Final Hearing Tr. | Final Hearing Transcript |
| CJV | Commissioner Johanson's Views |
| Zongshen Feb. 2021 SQR | Zongshen's February 2021 Supplemental Questionnaire Response |
| MTD Importer QR | MTD's December 2020 Importer Questionnaire Response |
| Commerce Crit. Circ. AD Memo/Commerce Crit. Circ CVD Memo | Commerce's March 2021 and October 2020 Critical Circumstances Memoranda |

i

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................... 1

I. THE RECORD EVIDENCE CANNOT SUSTAIN A
DETERMINATION OF CRITICAL CIRCUMSTANCES .............. 1

    A. Data Representing Imports Outside of the Statutory
Parameters of Analysis Cannot Serve as the Basis of a
Finding of Critical Circumstances ........................................ 3

    B. The Import Inventories Data Cannot Sustain a Finding of
Critical Circumstances ......................................................... 13

II. THE REMEDIAL EFFECTS OF THE ORDERS WERE NOT
SERIOUSLY UNDERMINED ...................................................... 17

CONCLUSION .......................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1,1,1,2--Tetrafluoroethane (R-134a) from China,*
Inv. Nos. 731-TA-1313 (Final), USITC Pub. 4679 (April 2017)............................ 10

*Allegheny Ludlum Corp. v. United States,*
27 CIT 1034 (2003) .................................................................................................. 5

*Allegheny Ludlum Corp. v. United States,*
30 CIT 1995, 475 F. Supp. 2d 1370 (2006) ............................................................. 4

*Calabrian Corp. v. United States,*
16 CIT 342, 794 F. Supp. 377 (1992) .................................................................... 16

*Celanese Chems. Ltd. v. United States,*
31 CIT 279 (2007) ................................................................................................. 16

*Certain Preserved Mushrooms from China, India, and Indonesia,*
Inv. Nos. 731-TA-777-779 (Final), USITC Pub. 3159, at 27-28 (Feb.
1999)................................................................................................................. 22, 23

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ............................................................................................. 4, 5

*Large Vertical Shaft Engines from China,*
Inv. Nos. 701-TA-637 and 731-TA-1471 (Final), USITC Pub. 5162
(February 2021) ...................................................................................................... 10

*Utility Scale Wind Towers from Canada, Indonesia, Korea, and
Vietnam,* Inv. Nos. 701-TA-627-629, USITC Pub. 5101 (August
2020), *et al.*............................................................................................................ 10

*Carbon and Certain Alloy Steel Wire Rod from South Africa and
Ukraine,*Inv. Nos. 731-TA-1353 and 1356, USITC Pub. 4766 (March
2018)........................................................................................................................ 10

**Statutes**

19 U.S.C. §§ 1671b, 1673b ........................................................................................ 3

19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i) ............................................. 1, 4, 14

19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A) ....................................................... 3, 18

19 U.S.C. §1673d(b)(4)(A)(ii) ........................................................................ 23

## INTRODUCTION

Plaintiff MTD Products Inc provides its reply to the response briefs of Defendant United States International Trade Commission and Defendant-Intervenor Briggs & Stratton LLC.  Defendants argue that: (1) the Commission's reliance on admittedly flawed *export* data as the foundation of its critical circumstances determination was proper; and (2), the Commission identified reasonable, substantial evidentiary bases for its finding that the remedial effect of the *Orders* was undermined seriously.   Neither argument survives analysis of the record – Plaintiff provides that analysis below.

## I.   THE RECORD EVIDENCE CANNOT SUSTAIN A DETERMINATION OF CRITICAL CIRCUMSTANCES

Simply put, "exports" are not "imports."  The statute requires the Commission to determine "whether the *imports* subject to the affirmative {Commerce critical circumstances} determination{s} … are likely to undermine seriously the remedial effect of the {antidumping and countervailing duty} order{s} to be issued." 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i) (Emphasis added).  Indeed, the SAA makes clear that the Commission is to determine "whether, by massively increasing *imports* prior to the effective date of relief, the *importers* have seriously

undermined the remedial effect of the order" and "whether the surge in *imports* prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." (Emphasis added.)   Defendants argue that the monthly *export* data reported by Zongshen constituted the "best information available" regarding subject *imports* over the pertinent period, and therefore, it was reasonable for the Commission to rely on this information as a substitute basis for its critical circumstances determination(s).

This argument is contrary to the law and record evidence – a review of that evidence demonstrates that there was no such surge in subject imports over the relevant period.  And just as importantly, even if the Commission's reliance on export data was appropriate, the fact remains that its affirmative finding of critical circumstances was unlawful given the direct evidence demonstrating that most of the imports in the relevant post-petition period were pursuant to orders made and under contracts agreed prior to and long before filing of the Petition.

A.   *Data Representing Imports Outside of the Statutory Parameters of Analysis Cannot Serve as the Basis of a Finding of Critical Circumstances*

First, the Government proffers no legal support for its assertion of the Commission's purported authority to rely only on the "best information available" – in this case, allegedly the monthly *export* data reported by Zongshen – where Congress and the statute both expressly delineate the information required when making a critical circumstances determination.  As a preliminary matter, the "best information available" standard under 19 U.S.C. §§ 1671b, 1673b, which was <u>repealed in 1994</u>, applied only generally to <u>preliminary determinations of material injury</u>, and never to <u>final determinations of critical circumstances</u> under 19 U.S.C. §§ 1671d(b)(4)(A), 1673d(b)(4)(A).  This reflects, in part, the extraordinary nature of the retroactive application of duties under U.S. law, and the seriousness with which Congress regards such a determination.  A critical circumstances determination must be based on not just the "best information available" but the information expressly required by the statute – *import* data.  A finding based on anything else is inherently speculative, suspect, and unsustainable.

To be sure, under the *Chevron* analysis, if the intent of the statute is clear then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984). Only "where Congressional intent is unclear… {is the question} whether the agency's {action} is based on a permissible construction of the statute." *Allegheny Ludlum Corp. v. United States*, 30 CIT 1995, 1998, 475 F. Supp. 2d 1370, 1375 (2006). At that point, the agency's construction of the statute becomes a question of reasonableness. *Id.* (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)). However, there is nothing unclear about the statute on this issue – the Commission's analysis must be based on the "*imports subject to the affirmative {Commerce's affirmative critical circumstances} determination{s}.*" 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i) (Emphasis added). In light of its unambiguous language, there is no need for any "construction" of the statute in this regard, nor application of the "reasonableness" standard, when the plain language of the statute is clear. Under *Chevron*, the Court and the

Commission must give effect to the "unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

Indeed, rendering a critical circumstances determination – which focuses specifically on the "timing and volume of imports" – based on clearly distorted *export* data reflecting imports outside of the pertinent post-Petition period is akin to Commerce calculating a dumping margin on entries that demonstrably fall outside of the relevant POI. An explanation from Commerce that such entries simply constituted the "best available information" from which to derive such margins would never pass muster before this Court. *See, e.g.*, *Allegheny Ludlum Corp. v. United States*, 27 CIT 1034, 1045-46 (2003) (upholding Commerce's refusal to base a dumping margin on facts available when the record demonstrated the imports at issue fell outside the POI and the respondent cooperated with Commerce's requests for information). Likewise, an affirmative finding of critical circumstances based on the "best available information," despite the clearly inapposite nature of that information is unlawful, particularly when it imposes such a grossly

punitive result on a party[1] that cooperated fully with the agency's requests for information throughout the investigation.

Defendants also have failed to identify even a single instance in which the Commission made an affirmative finding of critical circumstances on the basis of *export* data, and Plaintiff is not aware of any such determination.  Indeed, the Commission's reliance on export data here is especially egregious since the required import data were readily available.  *See* Commerce Crit. Circ. AD Memo at Attachment. *See also* Commerce Crit. Circ. CVD Memo at Attachment.  Those import data, adjusted for the appropriate timing,[2] provides the information required by the statute for this analysis, but unfortunately, the Commission declined to consider this information.

---

[1] In this case, a U.S. domestic manufacturer in the downstream industry which had utilized both the engines that are the subject of this investigation and the like kind domestic engines produced by Briggs & Stratton, now the sole domestic producer of such engines for lawn mowers.

[2] The law requires the base period to reflect imports made prior to the filing of the Petition, and the comparison period to reflect imports made after filing of the Petition, but prior to the imposition of provisional measures.  A proper statistical analysis requires the base and comparison periods to be equal in length.  Commerce selected its base period beginning in November 1, 2019.  Because the Petition was filed on March 18, 2020, the Pre-Petition base period equals 138 days.  An equal 138-day Post-Petition comparison period would therefore end on August 3, 2020.

Defendants nevertheless argue that it was reasonable for the Commission to rely on the distorted export data, because not all imports of subject merchandise were subject to Commerce's critical circumstances determinations. *See* Gov. Brief at 32. However, the Commission itself estimated that MTD accounted for [          ] of imports from China over the relevant periods. *See* Final Staff Report at Table IV-1. Moreover, as the Government noted, the Commission further estimated that Zongshen accounted for [          ] of total reported exports from China to the United States in 2019. *See* Final Staff Report at Table VII-1. Thus, a reasonable approximation of entries attributable to MTD using the available import data could readily be calculated. Commerce, for its part, used the same base and comparison periods for both the AD and CVD determination, *i.e.*, November 2019 – March 2020 as the base period and April 2020 – August 2020 as the comparison period, which Commission practice requires to be used in its determinations. *See* CCV at n. 243.

Adjusting the available import data for the timing of the filing of the Petition and accounting for equal base and comparison periods, a

reasonable approximation of entries attributable to MTD based on the available import data follows below.

| Import Data Subject to Commerce Critical Circumstances Determination | | | |
|---|---|---|---|
| Month | Days | Total Quantity (pcs) | MTD Quantity (pcs) |
| Nov-19 | 30 | 75,289 | 30,944 |
| Dec-19 | 31 | 109,341 | 44,939 |
| Jan-20 | 31 | 64,362 | 26,453 |
| Feb-20 | 28 | 82,975 | 34,103 |
| Mar-20 | 18 | 42,988 | 17,668 |
| | 138 | 374,955 | 154,107 |
| | | | |
| Mar-20 | 13 | 31,130 | 12,794 |
| Apr-20 | 30 | 75,731 | 31,125 |
| May-20 | 31 | 60,222 | 24,751 |
| Jun-20 | 30 | 167,330 | 68,773 |
| Jul-20 | 31 | 98,286 | 40,396 |
| Aug-20 | 3 | 32,069 | 13,180 |
| | 138 | 464,767 | 191,019 |
| | **Percent Change** | **24%** | **24%** |

*Source*: U.S. Import Data under primary HTSUS code.  Commerce AD Crit. Circ. Memo. at Attachment/Commerce CVD Crit. Circ. Memo at Attachment.[3]

This import data does not evince a massive surge of imports following the filing of the Petition relative to the Pre-Petition period. Further, the modest actual increase is easily explained by the substantial record evidence demonstrating the supply chain disruptions, port shut-

---

[3] A percentage applied to total March imports (18 days/31 days = 58 percent) provides a reasonable apportionment of total March imports (74,118) to the Pre-Petition period and to the Post-Petition period (13/31 = 42 percent).  Similarly, only a percentage of the total imports for August (331,378) should be apportioned to the Post-Petition period (3/31 = 9.7 percent).  This simple calculation allows for a reasonable and lawful comparative analysis of the available monthly import data.

(continued…)

downs, extended shipping periods, and the resulting economic shock caused by the once-in-a-century global pandemic impacting this period, *i.e.*, COVID-19, all of which was acknowledged by the Commission.[4]

The Commission also ignored the direct evidence that imports through July 2020 reflected purchase commitments under contracts that had been inked in 2019, long before the filing of the Petition. *See* MTD's Pre-Hearing Brief at Exhibit 6 (Declaration of Ed Griffin: ["


] Indeed, reference to this uncontroverted evidence is missing from the Commission's Views.[5]  The Commission disregarded critical record evidence demonstrating that MTD did not and – as a practical matter could not – both order and import such a massive quantity of engines in the short time immediately following the filing of the Petition but prior to imposition of provisional measures, in a way that

[4] *See* CCV at n. 241 (citing Final Staff Report at II-17 – 18); *See also* Final Staff Report at VII-3: "[


]"

[5] In fact, the Commission inexplicably determined that these Pre-Petition purchase orders had no effect on the export data relied upon.  *See* CCV at n. 246.

would seriously undermine the remedial effect of the *Orders*, given the substantial lead times and supply chain disruptions throughout this period.

This oversight is particularly glaring in light of the Commission's stance on this issue in this investigation's companion case, *Large Vertical Shaft Engines*, which concerned the exact same parties, industry, market, and lead times. In that case, in making a negative finding of critical circumstances, the Commission found that "given the lead times from China, portions of the post-petition import volumes were ordered before the petition was filed." *See Large Vertical Shaft Engines from China,* Inv. Nos. 701-TA-637 and 731-TA-1471 (Final), USITC Pub. 5162 (February 2021) at 54-55. It is unclear then why the Commission ignored precisely the same phenomenon in the *Small Vertical Shaft Engines* investigation, since the evidence in this case shows the same pattern, namely that the imports through July 2020 arrived pursuant to orders placed long before the Petition was filed.[6]

---

[6] *See also Carbon and Certain Alloy Steel Wire Rod from South Africa and Ukraine*, Inv. Nos. 731-TA-1353 and 1356 (Final), USITC Pub. 4766 (March 2018); *1,1,1,2-- Tetrafluoroethane (R-134a) from China,* Inv. Nos. 731-TA-1313 (Final), USITC Pub. 4679 (April 2017); *Utility Scale Wind Towers from Canada, Indonesia, Korea, and Vietnam*, Inv. Nos. 701-TA-627-629 and 731-TA-1458-1461 (Final), USITC Pub.

(continued…)

To be sure, the Commission's only statement on the matter, in a footnote, merely declared that consideration of the lead times did not factor in because its determination was based on "exports to the United States reported by the Zongshen Companies, not on monthly U.S. imports." *See* CCV at n. 256. The Commission provided no explanation as to why the lead times would not have the same distortive effect on the export data. Specifically, the record evidence demonstrates that the lead times are a function of both production and shipment time and were especially long in light of the aforementioned COVID-based supply chain disruptions. *See* Final Staff Report at II-17. Even assuming an equal split between production and shipment time, *i.e.*, 60 days each, then the exports reported by Zongshen for the months of April and May would have necessarily been ordered prior to the filing of the Petition (again not even considering the long-term agreements entered in 2019 under which these purchases were made).[7] Moreover, accounting for the shipment

---

5101 (August 2020), *et al* (in each of these decisions, the Commission made negative critical circumstances determinations based on record evidence demonstrating that post-petition imports reflected orders placed before filing of the Petition).

[7] *See also* Final Staff Report at II-11: "OEMs generally make most of their engine purchases in early winter, and consumers make most of their lawn mower purchases in spring and early summer."

(continued…)

portion of these lead times, the exports in at least the months of July and August would necessarily have entered the United States <u>after</u> provisional measures were imposed.[8]  Again, the Commission itself noted that "lead times in 2020 varied widely because of shipment disruptions related to COVID-19."  *See* CCV at n. 241.[9]  It is impossible to reconcile the Commission's acknowledgment of this fact with its failure to account for it in its analysis.

Indeed, an analysis of the appropriate data is especially necessary in a case where the record evidence demonstrates such significant lead times and peculiar circumstances like the *force majeure* caused by COVID-19.  The record in this case is clear that shipments reviewed by the Commission reflected imports that were either ordered long before the Petition was filed, or that did not enter until after provisional

---

[8] Further, the record demonstrates that MTD imported subject merchandise through [       ] during the POI, which would further extend the lead time for purposes of duty attachment with respect to at least a portion of Zongshen's exports.  *See* MTD Importer QR at 7.

[9] *See also* CJV at 3, noting: "Both MTD and Zongshen reported that Zongshen experienced production shutdowns from late January through March 2020 due to the pandemic.  This is supported by questionnaire data by Zongshen whose exports to the United States in February and March 2020 showed the [       ] volumes recorded for those two months over the POI (March is typically one of the highest volume months of the year—it was the month with the highest volume of exports for 2018, the second highest volume in 2019, and the third highest for 2017)."

measures were imposed, *i.e.*, those very shipments which were, in fact, subject to remedial measures. When clear, direct evidence demonstrates that a large portion of the data relied upon for such a determination is manifestly outside of the statutorily-prescribed parameters of the inquiry, such a finding cannot meet the substantial evidence standard.

Further, as illustrated above, a simple review of the import data available to the Commission and reasonably attributable to MTD for the pertinent time period shows no remarkable surge in imports ordered after the filing of the Petition but entered prior to the imposition of provisional measures. Had the Commission analyzed and relied upon the correct data it would have concluded that no critical circumstances existed. The appropriate import data reflect orders placed before the filing of the Petition through at least July. When the record demonstrates that the available import data are built on orders placed before the filing of the Petition, the Commission's practice is to make a negative finding of critical circumstances.

B.   *The Import Inventories Data Cannot Sustain a Finding of Critical Circumstances*

The Commission's analysis of import inventories is similarly flawed. Specifically, the Commission analyzed inventories from two

different points in time which reflect two entirely different and distinct periods – September 2020 and December 2019 – in the highly seasonal business cycle that characterizes the outdoor power equipment industry. *See* CCV at n. 249. Moreover, the Commission's analysis of these ending period import inventories bear no relation to the ending period import data subject to Commerce's critical circumstances determination, contrary to both the Commission's practice and applicable law.[10] As noted, the statute requires the Commission's inquiry to focus on the imports subject to Commerce's affirmative determination. 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i). Additionally, again, ending period import inventories from September 2020 reflect a large volume of imports that would have entered <u>after</u> the imposition of provisional measures on August 24, 2020. So, inventories for period the ending September 2020 are not at all probative of the remedial effects of the *Orders* being

---

[10] *See* CCV at n. 243: "Consistent with Commission practice, the same pre- and post-petition periods for both antidumping and countervailing duty critical circumstances analyses have been used in these determinations." However, that is directly contrary to the record regarding the Commission's analysis of this information.

(continued…)

undermined, as they necessarily reflect a large portion of imports *which already were subject to remedial measures*.[11]

In the absence of the required information, the Commission cannot substitute inherently flawed data as the next best thing.  The statute clearly specifies the data that the Commission must rely upon in this analysis, and the Commission has tools to secure those data.  Indeed, the Commission deployed these tools when it contacted Zongshen individually to request its monthly export data, and Zongshen complied. *See* Zongshen Feb. 2021 SQR.  Moreover, MTD fully cooperated and provided all requested information, and there is no record evidence to suggest otherwise.  And yet, having available the relevant data, the Commission proceeded to essentially ignore them.

For these reasons, the Commission's finding that there was a massive post-Petition surge in imports is unsupported by substantial record evidence. Taking the "best information available" standard in this

---

[11] On the one hand, the Government argues that it was reasonable for the Commission to ignore the extent to which lead times would have impacted the export data relied upon in the analysis of pre- and post-Petition entries.  On the other, regarding import inventories, the Government rather incredulously states "… it was reasonable for the Commission to consider end of September 2020 inventories since MTD reported that there were historically long lead times for imports in 2020." *See* Gov. Brief at 54.

context to its logical end would allow the Commission to make affirmative determinations based on little to no probative evidence at all, so long as that information constitutes the "best information available." And even if the Court concludes that the Commission's use of the "best information available" standard was lawful, this Court has held that the "best information available" standard must include all relevant information, even information not in the staff report, on the record at the time of Commission's determination. *See Calabrian Corp. v. United States*, 16 CIT 342, 351, 794 F. Supp. 377, 386 (1992). Indeed, "{t}he requirement to use the best information available obliges the Commission to *reasonably seek* all information that is accessible or obtainable from whatever source." (Emphasis added.) *See Celanese Chems. Ltd. v. United States*, 31 CIT 279, 288-91 (2007) (rejecting the Commission's reliance on deficient questionnaire response data in light of available, more accurate Census data to measure import volumes).[12]

---

[12] Indeed, the Commission expressly stated that it was relying on "facts available" as the foundation of its analysis of import inventories, with no discussion as to why more appropriate data were not available. *See* CCV at n. 248-9.

In this case, more accurate import data were available, as mentioned above.  The Court should find this information dispositive as to the question of pre- and post-Petition import volumes.

## II.  THE REMEDIAL EFFECTS OF THE ORDERS WERE NOT SERIOUSLY UNDERMINED

In their briefs, Defendants largely concede that imports during the post-Petition period had no detrimental impact on the going forward efficacy of the *Orders,* making almost no effort to refute the evidence and MTD's arguments on this critical point.[13]  Defendants merely dismiss MTD's arguments by claiming that MTD "urges this Court to second-guess the Commission and substitute Plaintiff's preferred findings for those of the Commission" with respect to this issue.  *See* Gov. Brief at 55. Not so.  MTD asks only that the Court consider whether the statutory requirements for the imposition of retroactive duties based on critical circumstances are satisfied.  Specifically, MTD urges the Court to consider whether there is any indication in the record of "circumstances indicating that the remedial effect of the {*Orders*} will be seriously

---

[13] The fact that the Government spent approximately three pages of its 69-page brief defending the Commission's finding that the alleged surge in imports seriously undermined the efficacy of the orders should tell the Court everything it needs to know about the sufficiency of the record on this point.

undermined," as required by 19 U.S.C. §§ 1671d(b)(4)(A) and 1673d(b)(4)(A). MTD submits that there are none, and that the record evidence demonstrates that the remedial effect of the *Orders* was not undermined, seriously or otherwise.

As Comm. Johanson noted:

> The channel through which undermining of the remedial effect of an order would typically occur is through the buildup of a larger than normal inventory of subject imports, enabling the importer to draw down its excessive volume of inventory after the imposition of an order, continuing to take advantage of its unfairly traded imports. In such a case, the domestic industry would continue to be at a disadvantage even after the order as it would be continuing to compete against importers' shipments from its unfairly traded inventory.

*See* CJV at 7.

Comm. Johanson went on to observe that by the time of the Commission's hearing, *i.e.*, prior to the imposition of the *Orders*, MTD had already drawn down most of its inventory of Chinese produced engines. *See* CJV at 9 (citing Final Hearing Tr. at 183 (Moll) ("Of the engines imported by MTD during the post-petition period, the organization used substantially all its inventory to accommodate

increased demands . . .").[14]   Further, the units imported by MTD from Zongshen were built specifically for MTD's use and were not a fungible commodity that could be used by any purchaser.   Therefore, reasoned Comm. Johanson, the facts on the record do not indicate that the subject imports entered in the five months after the filing of the Petition resulted in an inventory overhang that could seriously undermine the remedial effect of the *Orders*.

Defendants characterize Comm. Johanson's reasoning as a "red herring."  *See* Gov. Brief at 63.  According to Defendants, the Commission fully explained that, while MTD would not typically resell subject imports that it maintained in its inventories, the "additional inventories of imported SVSEs nonetheless represented orders that the domestic industry did not have the opportunity to obtain."  *Id*. at 64 (citing CCV at n. 266).  The Commission, for its part, stated that "{t}he effect of the increase in imports was to create a large stockpile of imports…" and that

---

[14] The record demonstrates a supply-demand squeeze during this time due to increased home improvement activities due to COVID-19 lockdowns of 2020 and MTD's inability to reliably source this merchandise domestically during this time. *See* Final Staff Report at II-14: "… several firms described a temporary increase in demand in 2020 because of COVID-19 stay-at home orders."; and, II-10: "Briggs' shutdown of its SVSE production and continued supply problems throughout 2020 led it to short MTD by approximately [                    ] for model-year 2020…"

"this rapid inventory buildup is likely to protract the adverse impact of the imports subject to the affirmative critical circumstances finding on the domestic industry." *See* CCV at 65.

The difficulty with the Commission's finding is the total absence of analysis of the actual record. The determination makes no reference, for example, to the record evidence demonstrating that there was in fact no "inventory overhang," and that the inventories of subject imports entered prior to the imposition of the *Orders* had already been exhausted. Thus, the observation made by Comm. Johanson is not a red herring but is rather akin to Chekhov's gun: an essential, determinative piece of evidence that Comm. Johanson spotted and the balance of the Commission missed. To be clear, there was no inventory of subject imports that could have competed with the domestic industry's offerings upon imposition of the *Orders*.

Further, the Government, like the Commission, continues to misstate the evidence standard applicable to determinations of critical circumstances. Specifically, in discussing the domestic industry's testimonial declarations as to the boon in business resulting from the provisional measures, including new, more favorable supply agreements,

the Government stated that – nonetheless – the purported stockpile in inventories "already had a damaging impact by lessening demand for SVSEs from the domestic industry" generally. *See* Gov. Brief at 67. However, even a single subject import would necessarily have the impact of lessening demand for domestic SVSEs generally. By the Government's logic, then, any imports at all during the post-petition period would be enough for an affirmative finding of critical circumstances. Put another way, the question is not whether post-petition imports represent sales that the domestic industry might have made (though Briggs and Stratton's documented production woes during the relevant time period make even this a matter of serious doubt).[15] The question, rather, is whether the imports "seriously undermined" the efficacy of the orders, and all of the record evidence – including Petitioner's own testimony - suggests that they did not.

In that regard, as Comm. Johanson noted and as the Commission's prior practice demonstrates, the "undermines seriously" test represents an extremely high standard:

---

[15] *See* Final Staff Report at II-10, "Supply Constraints."

{T}he plain meaning of the term 'undermines *seriously* establishes a very high standard: that the surge in imports *greatly and insidiously* weakens or subverts the effects of the order.

*Certain Preserved Mushrooms from China, India, and Indonesia,* Inv. Nos. 731-TA-777-779 (Final), USITC Pub. 3159, at 27-28 (Feb. 1999) (CCV of Chairman Bragg, Comm. Crawford, and Comm. Askey) (Emphasis added).

Evidence of some imports during the post-petition period tending to lessen demand for similar products from the domestic industry generally hardly constitutes a meaningful weakening or subversion of the effects of the *Orders*. It strains credulity that any factfinder could determine, after the testimonial declarations at the final hearing, referenced in MTD's initial brief,[16] that the imports in the post-Petition period seriously undermined the going forward efficacy of the *Orders*. This is likely

---

[16] "{T}he situation for domestic producers actually began to improve as soon as duties were imposed to level the playing field." Final Hearing Tr. at 9 (Orava). "{S}ince these cases were filed, conditions have gotten much better for domestic producers. Volumes have increased. Prices have increased." Final Hearing Tr. at 31 (Vaughn). "{I}n late August 2020, preliminary duties for the countervailing duty case went into effect, with preliminary antidumping duties following in October, and, for the first time in many years, we were able to compete on a level playing field... our volumes have improved, and we now see a path forward." Final Hearing Tr. at 39-40 (Coad). "{S}ince these cases were filed and preliminary duties went into effect, the domestic industry's performance has begun to improve." Final Hearing Tr. at 319 (Vaughn). The Commission made no mention of this testimony in its CCV, and not surprisingly, the Government did not attempt to rebut any of this evidence in its brief, either.

because the available import data does not in fact demonstrate a significant surge in imports, and in any event, the evidence also demonstrates that inventories of these imports were wholly exhausted prior to the imposition of the *Orders*. Thus, there is no record evidence that Post-Petition period entries could have weakened or subverted the effects of the *Orders*, much less "greatly and insidiously." *Id*.

The record evidence does not meet the high standard necessary to demonstrate that the imports at issue seriously undermined the effects of the *Orders*.[17]

---

[17] Commissioners Kearn and Karpel note that "{t}hey observe that the statute directs the Commission to consider the following factors in making this determination: 'the timing and volume the imports, a rapid increase in the inventories of the imports, and any other circumstances indicating that the remedial effect of the antidumping order will be seriously undermined.' 19 U.S.C. §1673d(b)(4)(A)(ii). In their analysis, they would therefore take into account a number of factors as appropriate to a given investigation …. and do not necessarily give precedence to the pre- and post-petition subject import volumes. Among the factors they may consider, depending on the facts of the investigation and the available data, are the parties' arguments, subject import volumes relative to apparent U.S. consumption or production, monthly changes in subject import volume, subject import inventories (both absolute and relative to imports or shipments of imports), purchaser inventories, pricing, and the domestic industry's performance." *See* CCV at n. 234. However, these Commissioners did not issue separate CCV and it is unclear whether and to what extent these considerations factored into their determinations or whether they were grounded entirely on the distorted post-Petition import volume data. The Commissioners also note that the statute emphasizes import data and do not list the probative value of export data among the enumerated factors.

## **CONCLUSION**

For these reasons, Plaintiff respectfully requests that the Court reverse the Commission's affirmative finding of critical circumstances as unsupported by substantial evidence and otherwise not in accordance with law.

Respectfully submitted,

/s/ *Alex Schaefer*
Alex Schaefer
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

*Counsel for MTD Products Inc*

Dated:      February 11, 2022

# **CERTIFICATE OF COMPLIANCE**

Pursuant to U.S. Court of International Trade Rule 2(b)(2) of the Court's Standard Chambers Procedures, undersigned counsel for Plaintiff MTD Products Inc, certifies this brief complies with the Court's type-volume limitation rules. This brief contains no more than 3732 words and therefore does not exceed 7,000 words. This brief also complies with all typeface and margin requirements.

/s/ *Alex Schaefer*
Alex Schaefer
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

*Counsel for MTD Products Inc*

Dated:      February 11, 2022