*NONCONFIDENTIAL VERSION*

---

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE M. MILLER BAKER

---

Court No. 21-00264

---

### MTD PRODUCTS, INC.,

*Plaintiff,*

**v.**

### UNITED STATES,

*Defendant,*

and

### BRIGGS & STRATTON, LLC,

*Defendant-Intervenor.*

---

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S FINAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

---

HENRY N.L. SMITH
Attorney for Defendant
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-3314
Fax: (202) 205-3111

ANDREA C. CASSON
Assistant General
Counsel for Litigation
(202) 205-3105

**DATED:  DECEMBER 17, 2021**
**FINAL BRIEF FILED:  MARCH 11, 2022**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................v

GLOSSARY ..................................................................x

I.    STATEMENT PURSUANT TO RULE 56.2 ..............................1

    A.    Administrative Determination Under Review .....................1

    B.    Question Presented and Summary of Argument ..................2

        1.    Were the Commission's Final Affirmative Critical Circumstances Determinations Supported by Substantial Evidence and in Accordance with Law? ...............................2

II.    STATEMENT OF FACTS ...........................................4

    A.    Procedural Background.........................................4

    B.    Summary of the Commission's Determinations..................10

        1.    The Commission's Affirmative Material Injury Determinations ....................................10

        2.    The Commission's Affirmative Critical Circumstances Determinations ...................................13

            a.    The Commission's consideration of the timing and volume of imports.............................15

            b.    The Commission's consideration of the rapid increase of inventories of imports............18

            c.    The Commission's consideration of MTD's arguments...............................20

III.    STANDARD OF REVIEW............................................26

IV.    ARGUMENT ......................................................30

    A.    Legal Standard for Critical Circumstances Analysis ..........30

    B.    The Commission's affirmative critical circumstances determinations are supported by substantial evidence and in accordance with law ..............322

## TABLE OF CONTENTS (cont'd)

1. The Commission's findings regarding the timing and the volume of imports are supported by substantial evidence and in accordance with the law.................................32

2. The Commission's findings regarding the rapid increase in inventories of imports are supported by substantial evidence and in accordance with law....................................399

C. Plaintiff's challenges to the Commission's affirmative critical circumstances determinations are unavailing. ....................................455

   1. The Commission's data inclusion period was reasonable. .................................455

   2. The Commission's reliance on export data to measure the timing and the volume of imports was reasonable and in accordance with the law. ........45

   3. The cases that Plaintiff cites are not inconsistent with the Commission's timing and volume analysis in this case. .............................533

   4. The Commission's reliance on end of December 2019 and end of September 2020 inventories to measure the rapid increase in inventories of imports was consistent with its practice and reasonable. ......................555

D. The Commission properly considered and addressed Plaintiff's remaining arguments and its conclusions were supported by substantial evidence and in accordance with the law.....................................577

   1. The Commission considered and reasonably rejected Plaintiff's argument that certain exports made during the post-petition period were ordered during the pre-petition period. ..............58

iii

## <u>TABLE OF CONTENTS (cont'd)</u>

2.  The Commission considered and reasonably rejected Plaintiff's argument that commercial uncertainties surrounding the domestic industry's ability to supply U.S. demand during the post-petition period explained the increase in export volume during this period............ 622

3.  The Commission considered and reasonably rejected Plaintiff's argument that the remedial effect of the orders was not undermined seriously because MTD imported custom-made SVSEs. ................................................. 655

4.  The Commission considered and reasonably rejected Plaintiff's argument that the remedial effect of the orders was not undermined seriously because the domestic industry's condition improved after provisional duties were imposed. ............................................. 688

**V.   CONCLUSION**.............................................................................**71**

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                    **Page(s)**

*Allegheny Ludlum Corp. v. United States*,
    30 CIT 1995, 475 F. Supp. 2d 1370 (2006) ................................... 29, 30

*Chemours Co. FC, LLC v. United States*,
    492 F. Supp. 3d 1333 (Ct. Int'l Trade  Feb. 22, 2021) ........................ 26

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ........................................................................ 29, 30

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) ........................................................... 54

*Coal. of Gulf Shrimp Indus. v. United States*,
    71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ................................... 28, 29

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ............................................................... 26, 27, 68

*CP Kelco US, Inc. v. United States*,
    24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) ........................................ 50

*Goss Graphics Sys., Inc. v. United States*,
    22 CIT 983, 33 F. Supp. 2d 1082 (1998),
    *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000) .................................................. 27

*Grupo Indus. Camesa v. United States*,
    85 F.3d 1577 (Fed. Cir. 1996) ............................................................. 68

*Hynix Semiconductor, Inc. v. United States*,
    30 CIT 1208, 431 F. Supp. 2d 1302 (2006) ................................... 28, 29

*ICC Indus., Inc. v. United States,*
    10 CIT 181, 632 F. Supp. 36 (1986) .................................................... 31

*ICC Indus., Inc. v. United States*,
    812 F.2d 694 (Fed. Cir. 1987) ....................................................... 31, 47

## TABLE OF AUTHORITIES (cont'd)

**Cases  (cont'd)**                                                        **Page(s)**

*Int'l Imaging Mats., Inc. v. U.S. Int'l Trade Comm'n,*
    30 CIT 1181 (2006) ................................................................... 29

*Int'l Indus., Ltd. v. United States,*
    311 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) ...................................... 27

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n,*
    253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd*, 753 F.
    App'x 913 (Fed. Cir. 2019) .................................................................. 27

*JMC Steel Grp. v. United States,*
    70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ............................ 28, 37, 45

*Mexichem Fluor Inc. v. United States,*
    179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016) ...................................... 54

*Nevinnomysskiy Azot v. United States,*
    32 CIT 642, 565 F. Supp. 2d 1357 (2008) .......................................... 27

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) .................................................... 27, 28

*Shandong TTCA Biochem. v. United States,*
    35 CIT 545, 774 F. Supp. 2d 1317 (2011) .......................................... 28

*Siemens Energy, Inc. v. United States,*
    806 F. 3d 1367 (Fed. Cir. 2015) ......................................................... 68

*U.S. Steel Grp. v. United States,*
    96 F.3d 1352 (Fed. Cir. 1996) .......................................... 27, 28, 29, 50

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ............................................................................ 26

*Usinor, et al. v. United States,*
    28 CIT 1107, 342 F. Supp. 2d 1267 (2004) ........................................ 28

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                    **Page(s)**

*Whirlpool Corp. v. United States,*
   37 CIT 1775 (2013) .................................................................... 29

*Zenith Radio Corp. v. United States,*
   437 U.S. 443 (1978) .................................................................... 30

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ....................................................... 26

19 U.S.C. § 1671b(d)(1)(B) ............................................................. 6

19 U.S.C. § 1671b(d)(2) ................................................................... 6

19 U.S.C. § 1671b(e) ........................................................................ 5

19 U.S.C. § 1671d(a)(2) .................................................................. 5

19 U.S.C. § 1671d(b)(4)(A) ............................................................. 5

19 U.S.C. § 1671d(b)(4)(A)(i) ......................................... 2, 13, 14, 30

19 U.S.C. § 1671d(b)(4)(A)(ii) ................................. 2, 14, 31, 46, 47

19 U.S.C. § 1673b(e) ........................................................................ 5

19 U.S.C. § 1673d(a)(3) .................................................................. 5

19 U.S.C. § 1673d(b)(4)(A) ............................................................. 5

19 U.S.C. § 1673d(b)(4)(A)(i) ............................................. 2, 14, 30

19 U.S.C. § 1673d(b)(4)(A)(ii) ................................. 2, 14, 31, 46, 47

28 U.S.C. § 2639(a)(1) .................................................................. 26

## TABLE OF AUTHORITIES (cont'd)

**Regulations**                                                      **Page(s)**

85 Fed. Reg. 20,667 (Apr. 14, 2020) ...................................................... 4, 5

85 Fed. Reg. 20,670 (Apr. 14, 2020) .......................................................... 5

85 Fed. Reg. 52,086 (Aug. 24, 2020).......................................................5, 6

85 Fed. Reg. 66,932 (Oct. 21, 2020).......................................................6, 7

85 Fed. Reg. 68,851 (Oct. 30, 2020).........................................................7

86 Fed. Reg. 14,071 (Mar. 12, 2021) .........................................................8

86 Fed. Reg. 14,077 (Mar. 12, 2021) .........................................................8

86 Fed. Reg. 23,675 (May 4, 2021) ......................................................9, 10

**Legislative Authorities**

Statement of Administrative Action
   to Uruguay Round Agreements Act,
   H.R. Rep. 103-316 (1994)............................................ 31, 32, 46, 47, 48

H.R. Rep. No. 96-317, 96th Cong. 1st Sess. (1979) .............................31, 47

**USITC Publications**

*Honey from Argentina and China*,
   Inv. Nos. 701-TA-402 and 731-TA-892-893 (Final),
   USITC Pub. 3470 (Nov. 2001) ...........................................................54

*Large Vertical Shaft Engines from China*,
   Inv. Nos. 701-TA-637 and 731-TA-1471 (Final),
   USITC Pub. 5162 (Feb. 2021).......................................... 35, 36, 53, 56

*Potassium Permanganate from China*,
   Inv. No. 731-TA-125 (Final),
   USITC Pub. 1480 (Jan. 1984)...........................................................53

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**USITC Publications (cont'd)**                                    **Page(s)**

*Synthetic Indigo from China*,
  Inv. No. 731-TA-851 (Final),
  USITC Pub. 3310 (June 2000)............................................................53

*Utility Scale Wind Towers from Canada, Indonesia, Korea,*
  *and Vietnam*,
  Inv. Nos. 701-TA-627–629 and 731-TA-1458–1461 (Final),
  USITC Pub. 5101 (Aug. 2020) ...........................................................53

# GLOSSARY

| Term | Definition |
|---|---|
| Briggs & Stratton | Briggs & Stratton, LLC |
| CBP | U.S. Customs and Border Protection |
| Commerce | U.S. Department of Commerce |
| Commission | U.S. International Trade Commission (Defendant) |
| Honda Power | Honda Power Equipment Manufacturing, Inc. |
| HTS | Harmonized Tariff Schedule |
| ITC | U.S. International Trade Commission (Defendant) |
| LTFV | less than fair value |
| MTD | MTD Products, Inc. (Plaintiff) |
| OEMs | original equipment manufacturers |
| POI | period of investigation |
| SAA | Statement of Administrative Action accompanying the Uruguay Round Agreements Act |
| SVSEs | small vertical shaft engines |
| Toro | The Toro Company |
| Zongshen | Chongqing Zongshen General Power Machine Co. |
| Zongshen Companies | Chongqing Zongshen General Power Machine Co., Chongqing Dajiang Power Equipment Co., Ltd., and Chongqing Zongshen Power Machinery Co., Ltd. |

Defendant U.S. International Trade Commission hereby opposes the motion for judgment upon the agency record filed by Plaintiff MTD Products, Inc., a U.S. importer of small vertical shaft engines from China. As discussed below, the Commission's final affirmative critical circumstances determinations regarding SVSEs from China were supported by substantial evidence and were otherwise fully in accordance with law. We respectfully ask this Court to affirm these determinations.

# I.    STATEMENT PURSUANT TO RULE 56.2

## A.    Administrative Determination Under Review

Plaintiff seeks review of the Commission's final affirmative critical circumstances determinations that imports subject to the final affirmative critical circumstances determinations by the U.S. Department of Commerce in the countervailing and antidumping duty investigations of SVSEs from China were likely to undermine seriously the remedial effect of the countervailing and antidumping duty orders.[1] Notice of the Commission's determinations was published at 86 Fed.

---

[1] Plaintiff does not seek review of the Commission's final affirmative determinations that an industry in the United States was materially injured by reason of imports of SVSEs from China found by Commerce to be sold in the United States at LTFV and to be subsidized by the government of China.

1

Reg. 22,975 (Apr. 30, 2021) (PD 162), Appx1259. The Commission's

Views for the determinations are contained in *Small Vertical Shaft*

*Engines from China*, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final),

USITC Pub. 5185, at 40-52 (Apr. 2021) (PD 164), Appx3041-3297.[2]

## B.   Question Presented and Summary of Argument

### 1. *Were the Commission's Final Affirmative Critical Circumstances Determinations Supported by Substantial Evidence and in Accordance with Law?*

Yes. Pursuant to the statute, the Commission considered the timing

and the volume of the imports subject to Commerce's final affirmative

critical circumstances determinations, the rapid increase in inventories

of those imports, as well as other relevant circumstances. *See* 19 U.S.C.

§§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii). The Commission concluded that

the imports subject to Commerce's final affirmative critical

circumstances determinations were likely to undermine seriously the

remedial effect of the antidumping and countervailing duty orders on

SVSEs from China. *See id.* at §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i).

---

[2] Citations to the public record are indicated by "PD," referring to list number 1 on the index of the administrative record (ECF 21), and citations to the confidential record are indicated by "CD," referring to list number 2 on the index of the administrative record (ECF 20). Citations to the Commission's Confidential Views ("Views") and to the confidential version of the staff report ("CR") are to CD 213, Appx2287-2355, Appx2081-2271, Appx2272-2286.

Contrary to Plaintiff's arguments, the Commission's analysis of the timing and the volume of imports and the rapid increase in inventories of imports was proper. Specifically, the Commission's selection of the months to include in the pre- and post-petition periods, its reliance on monthly export data as reported by the Chinese producers subject to Commerce's affirmative critical circumstances determinations, and its use of end of December and end of September inventories to measure the rapid increase in import inventories was reasonable, supported by substantial evidence, and in accordance with the law. Accordingly, the Court should sustain the Commission's analysis.

The Commission also addressed Plaintiff's arguments that certain exports of SVSEs to the United States made in the post-petition period were pursuant to purchase orders made during the pre-petition period; that the large increase in exports during the post-petition period was due to concerns that MTD had with Briggs & Stratton's continued viability as a supplier; and that the remedial effect of the orders was not undermined seriously because MTD's SVSEs are custom-made and the domestic industry's condition improved after provisional duties were imposed. The Commission thoroughly explained why it was rejecting

3

those arguments, and provided reasonable bases for its findings, based on substantial evidence in the record.

## II.     STATEMENT OF FACTS

### A.     Procedural Background

On March 18, 2020, Petitioner Briggs & Stratton, LLC, a U.S. producer of SVSEs, filed petitions alleging that a domestic industry was materially injured by reason of imports of SVSEs from China that were subsidized and sold at less than fair value, *i.e.*, dumped. Based on these petitions, the Commission instituted the underlying countervailing and antidumping duty injury investigations of SVSEs from China. *See* 85 Fed. Reg. 16,958 (Mar. 25, 2020) (PD 149), Appx1000-1001. Subsequently, in May 2020, the Commission made preliminary affirmative determinations that there was a reasonable indication that an industry in the United States was materially injured by reason of SVSEs from China that were alleged to be sold in the United States at LTFV and to be subsidized by the government of China. *See* 85 Fed. Reg. 27,243 (May 7, 2020) (PD 149), Appx1012.[3]

---

[3] Commerce found that the petitions met the statutory standing requirements and initiated its countervailing and antidumping duty investigations on April 14, 2020. *See* 85 Fed. Reg. 20,667 (Apr. 14, 2020) (PD 149), Appx1008-1011 (initiation of

On September 24, 2020, by letter to Commerce, Briggs & Stratton amended the petitions to allege that critical circumstances existed in the countervailing and antidumping duty investigations. "Critical circumstances" is a provision in both the countervailing and antidumping duty statutes that allows for the retroactive imposition of duties 90 days prior to the date that liquidation of entries is suspended and provisional duties are first imposed. *See* 19 U.S.C. §§ 1671b(e), 1673b(e). Both Commerce and the Commission must make separate final affirmative critical circumstances determinations, under somewhat different criteria, for retroactive duties to be fully imposed. *See id.* at §§ 1671d(a)(2), (b)(4)(A), 1673d(a)(3), (b)(4)(A).

On August 24, 2020, Commerce issued its preliminary affirmative determination in the countervailing duty investigation, preliminarily finding that SVSEs from China were subsidized by the Government of China. *See* 85 Fed. Reg. 52,086 (Aug. 24, 2020) (PD 149), Appx1056-1059 (preliminary affirmative countervailing duty determination). Because Commerce made a preliminary affirmative determination in

---

countervailing duty investigation); 85 Fed. Reg. 20,670 (Apr. 14, 2020) (PD 149), Appx1002-1007 (initiation of antidumping duty investigation).

the countervailing duty investigation, it suspended liquidation of entries of subject subsidized merchandise and imposed provisional countervailing duties on entries of subject subsidized merchandise beginning on August 24, 2020. *See* 85 Fed. Reg. at 52,088 (PD 149), Appx1058.[4]

On October 21, 2020, Commerce issued its preliminary determination in the antidumping duty investigation, preliminarily finding that SVSEs from China were sold in the United States at LTFV. *See* 85 Fed. Reg. 66,932 (Oct. 21, 2020) (PD 149), Appx1110-1113 (preliminary affirmative antidumping duty determination). Because Commerce made a preliminary affirmative determination in the antidumping duty investigation, it suspended liquidation of entries of subject dumped merchandise and imposed provisional antidumping

---

[4] Pursuant to 19 U.S.C. §§ 1671b(d)(1)(B) and (d)(2), Commerce directed U.S. Customs and Border Protection to suspend liquidation of entries of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of Commerce's preliminary affirmative determination in the Federal Register, or August 24, 2020, and to require a cash deposit equal to the estimated countervailable subsidy rates indicated in Commerce's preliminary affirmative determination.

duties on entries of subject dumped merchandise beginning on October 21, 2020. *See* 85 Fed. Reg. at 66,933-34 (PD 149), Appx1111-1112.[5]

In its October 21, 2020 notice of an affirmative preliminary determination in the antidumping duty investigation, as well as in an October 30, 2020 notice regarding the countervailing duty investigation, Commerce made preliminary affirmative critical circumstances determinations. *See* 85 Fed. Reg. at 66,933 (PD 149), Appx1111 (antidumping duty investigation); 85 Fed. Reg. 68,851 (Oct. 30, 2020) (PD 149), Appx1118-1119 (countervailing duty investigation).[6]

---

[5] Because Commerce did not preliminarily find any foreign producers or exporters to have a *de minimis* margin and the scopes of the antidumping and countervailing duty investigations were the same, subject dumped merchandise overlapped with subject subsidized merchandise and, although liquidation was already suspended pursuant to Commerce's preliminary affirmative determination in the countervailing duty investigation, additional provisional duties were imposed in the form of antidumping duties.

[6] In the antidumping duty investigation, Commerce preliminarily determined that critical circumstances existed with respect to imports of SVSEs from China for individually examined Chinese producer and exporter Chongqing Zongshen General Power Machine Co., Chongqing Dajiang Power Equipment Co., Ltd., and Chongqing Zongshen Power Machinery Co., Ltd. (collectively, the "Zongshen Companies") and all other Chinese producers and exporters that did not receive a separate subsidy rate (collectively the "China-wide entity"), but not for any other Chinese producers or exporters. 85 Fed. Reg. at 66,933 (PD 149), Appx1111.

In the countervailing duty investigation, Commerce preliminarily determined that critical circumstances existed with respect to imports of SVSEs from China with respect to only Zongshen, but not for any other Chinese producers or exporters. 85 Fed. Reg. at 68,852 (PD 149), Appx1119. Commerce notified the Commission of its preliminary affirmative critical circumstances determination by letter dated

On March 12, 2021, Commerce issued its final determination in the antidumping duty investigation that SVSEs from China were sold in the United States at LTFV. *See* 86 Fed. Reg. 14,077 (Mar. 12, 2021) (PD 149), Appx1251-1254 (final affirmative antidumping duty determination). Commerce also made a final determination that critical circumstances existed for dumped imports from the "Zongshen Companies" and the "China-wide entity," but not for any other Chinese producers or exporters. *See Commerce Issues and Decision Memorandum,* at 9-12 (Mar. 5, 2021) (PD 149), Appx1128-1131 (antidumping duty investigation).

Also, on March 12, 2021, Commerce issued its final determination in the countervailing duty investigation that SVSEs from China were subsidized by the Government of China. *See* 86 Fed. Reg. 14,071 (Mar. 12, 2021) (PD 149), Appx1255-1258 (final affirmative countervailing duty determination). Commerce also made a final determination that critical circumstances existed with respect to only Zongshen, but not for any other Chinese producers or exporters. *See Commerce Issues and*

---

October 27, 2020. *See* Letter from Commerce Deputy Assistant Secretary, to Commission Chair (Oct. 27, 2020) (PD 91), Appx2531.

*Decision Memorandum*, at 4 (Mar. 5, 2021) (PD 149), Appx1210

(countervailing duty investigation).

Subsequently, in April 2021, the Commission made final affirmative

determinations that an industry in the United States was materially

injured by reason of SVSEs from China found by Commerce to be sold

in the United States at LTFV and to be subsidized by the government of

China. *See* 86 Fed. Reg. 22,975 (Apr. 30, 2021) (PD 162), Appx1259. The

Commission also made final affirmative critical circumstances

determinations with respect to the imports subject to Commerce's final

affirmative critical circumstances determinations in the antidumping

and countervailing duty investigations. *See* 86 Fed. Reg. at 22,975 n.2

(PD 162), Appx1259.

On May 4, 2021, Commerce issued the antidumping and

countervailing duty orders on SVSEs from China. *See* 86 Fed. Reg.

23,675 (May 4, 2021), Appx1260-1263. Since both Commerce and the

Commission made final affirmative critical circumstances

determinations, Commerce instructed CBP to retroactively apply duties

to unliquidated entries of imported SVSEs subject to Commerce's final

affirmative critical circumstances determinations. Specifically,

9

Commerce instructed CBP to retroactively apply antidumping duties to unliquidated entries of SVSEs from the Zongshen Companies and the China-wide entity that entered the United States on or after July 23, 2020, which was 90 days prior to Commerce's October 21, 2020 preliminary affirmative determination in the antidumping duty investigation. *See* 86 Fed. Reg. at 23,676, Appx1261. Commerce also instructed CBP to retroactively apply countervailing duties to unliquidated entries of SVSEs from Zongshen that entered the United States on or after May 26, 2020, which was 90 days prior to Commerce's August 24, 2020 preliminary affirmative determination in the countervailing duty investigation. *See* 86 Fed. Reg. at 23,677, Appx1262.

### B. Summary of the Commission's Determinations

#### 1. *The Commission's Affirmative Material Injury Determinations*

In determining whether an industry in the United States was materially injured by reason of imports of subject merchandise, the Commission first defined a single domestic like product corresponding to the scope of the antidumping and countervailing duty investigations. Views at 8-9, 16, Appx2292-2293, Appx2300. The Commission also

10

defined the domestic industry to include U.S. producers of SVSEs, Briggs & Stratton and Honda Power Equipment Manufacturing, Inc., the former accounting for the majority of domestic production in 2019. Views at 18, 25, Appx2302, Appx2309.

In considering the conditions of competition, the Commission explained that most SVSEs are sold to original equipment manufacturers that manufacture lawn mowers and other outdoor power equipment and that the OEM market is concentrated, with MTD and The Toro Company being the only two OEMs producing consumer lawn mowers after 2019. Views at 23, Appx2307. The Commission noted that demand for SVSEs is seasonal based on increased demand for lawn mowers in the spring and summer. Views at 23, Appx2307. Further, the Commission noted that the two largest importers of subject merchandise were MTD and the Kohler Company. Views at 27, Appx2311.

The Commission further explained that price negotiations between SVSE producers and OEMs typically begin in the spring and conclude in the summer for engines that will not be delivered until the fall or winter, which will then be assembled into lawn mowers for sale during

11

the following spring and summer. Views at 23-24, 30, Appx2307-2308, Appx2314. The Commission also found that U.S. and subject engine suppliers compete for the same sales to OEMs, with MTD purchasing SVSEs from both U.S. producers and Zongshen. Views at 29-30 & n.113, Appx2313-2314. Furthermore, the Commission found that there is at least a moderate degree of substitutability between domestically produced SVSEs and subject imports, with a higher degree of substitutability among engines at the time of engine selection, which typically occurs during contract negotiations. Views at 29, Appx2313.

The Commission found that the volume of subject imports was significant in absolute terms and relative to consumption in the United States and that the increase in subject imports in interim 2020 was significant both in absolute terms and relative to consumption. Views at 35, Appx2319. Furthermore, the Commission found that subject imports undersold the domestic like product to a significant degree, which resulted in lost sales and market share, and that subject imports prevented U.S. price increases which otherwise would have occurred, to a significant degree. Hence, the Commission found that subject imports

12

had significant effects on the prices for the domestic like product. Views at 43, Appx2327.

Finally, the Commission found that the lower-priced subject imports caused the domestic industry to lose sales and market share, which reduced the industry's output and revenues from what they would have been otherwise. Furthermore, the significant price suppression caused by subject imports reduced the domestic industry's revenues from what they would have been otherwise and contributed to the domestic industry's deteriorating financial performance. Views at 48-49, Appx2332-2333. The Commission also concluded that other causes cannot explain the injury that it attributed to subject imports. Hence, the Commission found that subject imports had a significant impact on the domestic industry and, accordingly, the Commission determined that the domestic industry was materially injured by reason of subject imports. Views at 55, Appx2339.

### 2. *The Commission's Affirmative Critical Circumstances Determinations*

After determining that an industry in the United States was materially injured by reason of SVSEs from China, and because Commerce made final affirmative critical circumstances determinations

with respect to certain Chinese producers, the Commission was statutorily required to determine "whether the imports subject to the affirmative {Commerce critical circumstances} determination{s} ... are likely to undermine seriously the remedial effect of the {antidumping duty and countervailing duty} order{s} to be issued." 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i). In evaluating this issue, as required by statute, the Commission considered the timing and the volume of the imports subject to Commerce's affirmative critical circumstances determinations, the rapid increase in inventories of those imports, as well as any other circumstances indicating that the remedial effect of the antidumping and countervailing duty orders would be seriously undermined. *See id.* at §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

The Commission concluded that the imports subject to Commerce's affirmative critical circumstances determinations were likely to undermine seriously the remedial effect of the antidumping and countervailing duty orders and made affirmative critical circumstances determinations with regard to those imports.[7] The Commission made

---

[7] Commissioner Johanson made negative critical circumstances determinations and wrote separate views. *See* Separate Views of Comm'r David S. Johanson (CD 212), Appx2356-2372.

14

separate critical circumstance determinations for each of the

investigations. *See* Views at 60-66, Appx2344-2350 (finding critical

circumstances in antidumping investigation); Views at 66-70,

Appx2350-2354 (finding critical circumstances in countervailing duty

investigation). But, given the great overlap between the dumped and

subsidized imports subject to Commerce's critical circumstances

determinations, the Commission's analysis and findings for both

investigations were essentially the same. We therefore summarize those

findings together.

>     a. *The Commission's consideration of the timing and*
>        *volume of imports*

In addressing the timing and volume of imports subject to

Commerce's affirmative critical circumstances determinations, the

Commission relied on data reflecting monthly exports to the United

States as reported by the Chinese producers who were subject to

Commerce's final affirmative critical circumstances determinations.

In order to determine whether there had been an increase in such

exports prior to provisional duties being imposed, the Commission

compared the volume of cumulative monthly exports prior to the filing

of the petitions with the volume of cumulative monthly exports

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

subsequent to the filing of the petitions but prior to the date that

provisional duties were first imposed. Based on the date of the filing of

the petitions (March 18, 2020) and the date that provisional duties were

first imposed (August 24, 2020), the Commission compared cumulative

monthly exports during five month pre- and post-petition periods of

November 2019 through March 2020 and April 2020 through August

2020. Views at 59-60 & n.241, Appx2343-2344.

In both the antidumping and countervailing duty investigations, the

Commission found that the volume of cumulative monthly exports in

the post-petition period (April 2020 to August 2020) increased sharply

relative to the volume of cumulative monthly exports in the comparable

(five-month) pre-petition period (November 2019 to March 2020) and

that the volumes associated with these increases were large. Views at

62, 67-68, Appx2346, Appx2351-2352. In the antidumping duty

investigation, the Commission found an increase of [████] percent and,

in the countervailing duty investigation, the Commission found an

increase of [████] percent. Views at 60, 66, Appx2344, Appx2350.[8]

---

[8] The Commission also considered the volume associated with that increase,
noting that that the volume of cumulative monthly exports in the post-petition
period comprised [███] percent and [███] percent, respectively, of total apparent
U.S. consumption during interim 2020 (January through September 2020) and that

In addition, the Commission found that monthly exports subject to Commerce's affirmative critical circumstances determinations showed a very different trend in 2020, as compared to prior years during the January 2017 to September 2020 period of investigation. The Commission explained that, in 2017, 2018, and 2019, monthly exports of SVSEs reported by Zongshen and its affiliates were at their highest levels during the winter and fall months, or January through March and September through November, and they were at relatively low levels during the spring and summer months, or April through July. However, in 2020, these monthly exports showed a very different pattern as they were at their highest levels during the spring and summer months, or April to July 2020, which, notably, was prior to the imposition of provisional duties in August 2020. Views at 61-62, 67-68, Appx2345-2346, Appx2351-2352.

---

the volume increased as total apparent U.S. consumption was lower in interim 2020 as compared to the same period in 2019. *See* Views at 61-62, 66, 68, Appx2345-2346, Appx2350, Appx2352.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

### b. The Commission's consideration of the rapid increase of inventories of imports

In addressing the rapid increase in inventories of imports subject to Commerce's affirmative critical circumstances determinations, the Commission relied on data for end-of-period U.S. inventories of imported SVSEs from Zongshen as reported by U.S. importers [████] and the [████████]. Views at 65 n.263, 69 n.282, Appx2349, Appx2353. ([████] accounted for [████████] of these imports, as the [████████████] of SVSEs during the POI). Views at 64, 69, Appx2348, Appx2353.

Because it did not have end-of-period inventory data that lined up precisely with the five-month pre- and post-petition periods, the Commission used reported end of 2019 (December 2019) inventories to estimate end of pre-petition period inventories and end of interim 2020 (September 2020) inventories to estimate end of post-petition period inventories. Views at 61 n.249, 67 n.271, Appx2345, Appx2351. The Commission found that the effect of the sharp increases in monthly exports subject to Commerce's affirmative critical circumstances determinations, prior to the imposition of provisional duties, was to

18

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

create a subsequent large stockpile of subject import inventories. Views at 64, 69, Appx2348, Appx2353.

In addition, the Commission found that the surge in monthly exports subject to Commerce's affirmative critical circumstances determinations, prior to imposition of provisional duties, and the subsequent substantial buildup in subject import inventories, which were [          ] held by U.S. importer MTD, meant that MTD had less need to buy SVSEs from domestic producers for the 2021 outdoor power equipment season. Views at 65, 69-70, Appx2349, Appx2353-2354. The Commission observed that subject exports entered during the period when domestic producers and purchasers typically negotiate and set prices for engines delivered for the 2021 lawn mower season. Views at 65, 70, Appx2349, Appx2354.

The Commission further considered the large increases in monthly exports of SVSEs and subsequent buildup of inventories within the context of its earlier affirmative material injury findings, including that subject imports significantly undersold the domestic like product and that subject import prices were among their lowest of the POI during the second and third quarters of 2020. In light of this underselling and

19

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

the [████████] performance of the domestic industry in interim 2020,

the Commission found that the massive surge of monthly exports

subject to Commerce's affirmative critical circumstances

determinations, the volume associated with that surge, and the rapid

subject import inventory buildup were all likely to protract the adverse

impact of such imports on the domestic industry and thereby

undermine seriously the remedial effect of the antidumping and

countervailing duty orders. Thus, the Commission made final

affirmative critical circumstances determinations with regard to those

imports. Views at 65-66, 70, Appx2349-2350, Appx2354.

### c. The Commission's consideration of MTD's arguments

The Commission considered and responded to each of MTD's

arguments against a finding of critical circumstances. The Commission

explained that none of these arguments negated its affirmative critical

circumstances findings.

MTD first argued that any increase in the volume of imports subject

to Commerce's affirmative critical circumstances determinations during

the post-petition period would be distorted by the fact that Zongshen

could not produce SVSEs during late January to March 2020 due to

COVID-19 related plant shutdowns. Views at 58, 62 n.253, 68 n.276, Appx2342, Appx2346, Appx2352.

In response to this argument, the Commission explained that, to the extent that Zongshen was affected by production shutdowns in January through March 2020, those shutdowns did not appear to have affected its ability to export SVSEs to the United States. In fact, Zongshen's total monthly exports to the United States in January through March 2020 were higher than during the same period in 2019. Views at 62-63, 68 n.277, Appx2346-2347, Appx2352. Additionally, and contrary to MTD's contention that imports made during the post-petition period were pursuant to back orders made during the pre-petition period, the Commission noted that MTD acknowledged in its post-hearing brief that it placed orders with Zongshen "through spring 2020," which would have included time after the petitions were filed on March 18, 2020, and that these orders began arriving as imports in the United States in July and August 2020, also during the post-petition period. Views at 63, Appx2347.

In further response to this argument, the Commission noted that the largest monthly export volumes and increases in exports to the United

States from Zongshen came in June and July 2020, which was late in the post-petition period and well after March 2020 when Zongshen assertedly reopened its plants. Views at 68-69, Appx2352-2353. Also, the monthly export volumes in June and July 2020 were higher than any other month in the pre-petition period and were the largest monthly export volumes throughout the entire POI, suggesting that the high levels of exports made during these months could not reasonably be explained as simply a catch up on a backlog of orders made during the pre-petition period. Views at 63-64, 69 n.278, Appx2347-2348, Appx2353.

MTD also made several arguments about the alleged inability of the domestic industry to meet increased demand in the summer of 2020. Specifically, MTD argued that its increased volume of imports during the post-petition period was not due to the threat of impending provisional duties but, rather, was due to its concerns about U.S. COVID-19 related plant closures and about Briggs & Stratton's financial condition and continued viability as a supplier. *See* Views at 58, 62-63 n.253, 68 n.276, Appx2342, Appx2346-2347, Appx2352.

22

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

In response to these arguments, the Commission found that, while Briggs & Stratton reported that it experienced some initial decline in production and supply chain delays due to the COVID-19 pandemic, it was deemed an essential business and continued to manufacture SVSEs throughout the pandemic in 2020. Views at 63 n.257, Appx2347. Similarly, the Commission noted that the other domestic producer, Honda Power, reported [████████████████████████████████████████████████████████████████████████]. Views at 63 n.257, Appx2347.

The Commission also considered MTD's argument that it was forced to turn to subject import supply in 2020 due to concerns regarding Briggs & Stratton's viability. Views at 50-52, Appx2334-2336. As described in its analysis of the impact of subject imports, the Commission found that evidence on the record supported that, at least into July 2020, which was well into the post-petition period, Briggs & Stratton was meeting MTD's forecasted demand for SVSEs, and that MTD continued to seek supply from Briggs & Stratton during this period. Views at 51 & n.215, Appx2335. In the Commission's view, this evidence belied MTD's assertions that its alleged concerns regarding

23

Briggs & Stratton's continued viability accounted for the large increases in monthly exports from Zongshen and its affiliates during the post-petition period. Views at 64, Appx2348.

Moreover, the Commission noted that the unfairly traded imports themselves were in part responsible for Briggs & Stratton's declining revenues and financial performance, which in turn was allegedly what led MTD to question the firm's viability. As such, the Commission found that MTD's proffered reason for increasing its imports from Zongshen during the post-petition period – Briggs & Stratton's poor financial condition resulting, in part, from subject import competition – only further supported the Commission's conclusion that the effect of MTD's import purchases and subsequent inventories would be to continue to injure the domestic industry and undermine seriously the remedial effect of the antidumping and countervailing duty orders. Views at 62-63 n.253, 68 n.276, Appx2346-2347, Appx2352.

MTD also argued that, despite any increases in import volumes during the post-petition period, the remedial effect of the orders was not undermined seriously in this case as evidenced by the fact that MTD entered into a new contract with Briggs & Stratton in late 2020 that

included significant price increases. Views at 58 n.239, Appx2342. In response, the Commission noted that the domestic industry's new supply contracts with OEMs, such as MTD, in late 2020 were not for a fixed number of SVSEs. Views at 65 n.266, 70 n.285, Appx2349, Appx2354. Furthermore, the Commission found that the new supply contracts did not diminish the impact of the particularly high volumes of monthly exports subject to Commerce's affirmative critical circumstances determinations, which were exported prior to provisional duties being imposed, subsequently inventoried, and served as a disincentive for OEMs to obtain additional supplies of SVSEs from domestic producers for the 2021 outdoor power equipment season. Views at 65 n.266, 70 n.285, Appx2349, Appx2354.

Finally, the Commission noted MTD's argument that its inventories of imported Zongshen SVSEs were built specifically and exclusively for MTD's outdoor power equipment and could not be resold in the U.S. market. Views at 65 n.266, 70 n.285, Appx2349, Appx2354. Addressing this argument, the Commission observed that these inventories of imported SVSEs, nonetheless, represented orders for the manufacture of MTD-compatible SVSEs that the domestic industry did not have the

25

opportunity to obtain. Views at 65 n.266, 70 n.285, Appx2349,

Appx2354.

## III.   STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must uphold the

Commission's determinations, findings, and conclusions unless they are

"unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Chemours*

*Co. FC, LLC v. United States*, 492 F. Supp. 3d 1333, 1335 (Ct. Int'l

Trade Feb. 22, 2021). The Commission's determinations are presumed

to be correct and the burden is on the party challenging the

determination to demonstrate otherwise. 28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being

"such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S.

474, 477 (1951) (quotations omitted). Substantial evidence is

"something less than the weight of the evidence, and the possibility of

drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by

substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620

26

(1966) (citations omitted); *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1347 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019).

Moreover, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006); *Int'l Indus., Ltd. v. United States*, 311 F. Supp. 3d 1325, 1333 (Ct. Int'l Trade 2018). In its role as trier of fact in injury investigations, "the Commission 'has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.'" *Nevinnomysskiy Azot v. United States*, 32 CIT 642, 653, 565 F. Supp. 2d 1357, 1367-68 (2008) (quoting *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000)). As the fact finder, the "ITC is afforded considerable discretion in evaluating information obtained from questionnaires." *Int'l Indus.*, 311 F. Supp. 3d at 1333 (quotations omitted). As the Federal Circuit has

stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder — here . . . the Presidentially-appointed, Senate-approved Commissioners — to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359. "Congress has allocated to the Commission the task of making these complex determinations," the Federal Circuit has explained, and "{o}urs is only to review those decisions for reasonableness." *U.S. Steel Grp.*, 96 F.3d at 1357. In other words, the Court may not "reweigh the evidence or substitute its own judgment for that of the agency." *Usinor, et al. v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004); *Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1361 (Ct. Int'l Trade 2015); *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2015).

"When evaluating challenges to the ITC's choice of methodology," the Court has explained, "the court will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp.*, 70 F. Supp. 3d at 1316 n.4 (citing *Shandong TTCA Biochem. v. United States*, 35 CIT 545, 556, 774 F. Supp. 2d 1317, 1327 (2011)); *accord Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 1215, 431 F. Supp. 2d 1302, 1306,

28

1310–11 (2006); *Coal. of Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1365

(citing *U.S. Steel Grp.*, 96 F.3d at 1361-62); *see also Whirlpool Corp. v.*

*United States*, 37 CIT 1775, 1786 (2013) ("As long as the agency's

methodology and procedures are a reasonable means of effectuating the

statutory purpose . . . the court will not . . . question the agency's

methodology.") (quoting *Int'l Imaging Mats., Inc. v. U.S. Int'l Trade*

*Comm'n,* 30 CIT 1181, 1189 (2006)).

In reviewing the Commission's construction of a statute, this Court

"applies the *Chevron* two-prong analysis, which first looks at whether

Congress has spoken directly to the issue." *Allegheny Ludlum Corp. v.*

*United States*, 30 CIT 1995, 1998, 475 F. Supp. 2d 1370, 1375 (2006)

(citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S.

837, 842–43 (1984)). If the intent of the statute is clear, then "that is the

end of the matter; for the court, as well as the agency, must give effect

to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S.

at 842-43.  However, "where Congressional intent is unclear, 'the court

does not simply impose its own construction on the statute … {r}ather …

the question for the court is whether the agency's {action} is based on a

permissible construction of the statute.'" *Allegheny Ludlum*, 30 CIT at

1998, 475 F. Supp. 2d at 1375 (quoting *Chevron*, 467 U.S. at 843).

Moreover, so long as the agency's construction is a reasonable one, it

"need not be the only reasonable interpretation, or even the most

reasonable interpretation." *Id.* (citing *Zenith Radio Corp. v. United*

*States*, 437 U.S. 443, 450 (1978)).

## IV.   ARGUMENT

This Court should affirm the Commission's final affirmative critical

circumstances determinations. Contrary to Plaintiff's arguments, the

Commission's analysis of the timing and the volume of imports and the

rapid increase in inventories of imports was supported by substantial

evidence and in accordance with the law. Plaintiff's challenge to the

Commission's determinations amounts to no more than a request for

the Court to reweigh evidence and arguments that the Commission

reasonably considered as set out in its determinations.

### A. Legal Standard for Critical Circumstances Analysis

The statute requires the Commission to determine "whether the

imports subject to the affirmative {Commerce critical circumstances}

determination{s} ... are likely to undermine seriously the remedial effect

of the {antidumping duty and countervailing duty} order{s} to be

issued." 19 U.S.C. §§ 1671d(b)(4)(A)(i), 1673d(b)(4)(A)(i). The statute

further provides that, in making this determination, the Commission shall consider, among other factors it considers relevant:

(I)    the timing and the volume of the imports;

(II)    any rapid increase in inventories of the imports; and

(III)    any other circumstances indicating that the remedial effect of the {countervailing and antidumping duty orders} will be seriously undermined.

19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

The legislative history for the critical circumstances provision indicates that the provision was designed "to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by {Commerce}." *ICC Indus., Inc. v. United States*, 812 F.2d 694, 700 (Fed. Cir. 1987) (quoting H.R. Rep. No. 96-317, 96th Cong. 1st Sess., at 63 (1979)), *aff'g* 10 CIT 181, 632 F. Supp. 36 (1986). Furthermore, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, indicates that the Commission's critical circumstances determination is focused "on whether an order's

31

effectiveness is undermined by increasing shipments prior to the

effective date of the order." H.R. Rep. 103-316, vol. I at 877 (1994). The

SAA further indicates that the Commission is to determine "whether,

by massively increasing imports prior to the effective date of relief, the

importers have seriously undermined the remedial effect of the order"

and "whether the surge in imports prior to the suspension of

liquidation, rather than the failure to provide retroactive relief, is likely

to seriously undermine the remedial effect of the order." *Id.*

### B. The Commission's affirmative critical circumstances determinations are supported by substantial evidence and in accordance with law

#### 1. *The Commission's findings regarding the timing and the volume of imports are supported by substantial evidence and in accordance with the law.*

In addressing the timing and the volume of imports subject to

Commerce's affirmative critical circumstances determinations, the

Commission reasonably: (1) relied on data reflecting monthly exports to

the United States as reported by the Chinese producers who were

subject to Commerce's final affirmative critical circumstances

determinations instead of import data;[9] and (2) used five-month

---

[9] For the antidumping duty investigation, the Commission relied on monthly exports reported by Zongshen and certain of its affiliates; the Commission did not

comparison periods, with the pre-petition period spanning November 2019 through March 2020 and post-petition period covering April 2020 through August 2020.

It was reasonable for the Commission to rely on export data in this case because not all imports of subject merchandise were subject to Commerce's affirmative critical circumstances determinations. In the antidumping duty investigation, Commerce found that critical circumstances existed for Chinese producer Zongshen and certain of its affiliates and the China-wide entity. *See Commerce Issues and Decision Memorandum,* at 9-12 (Mar. 5, 2021) (PD 149), Appx1128-1131 (antidumping duty investigation). And in the countervailing duty investigation, Commerce found that critical circumstances existed with respect to only Zongshen. *See Commerce Issues and Decision Memorandum*, at 4 (Mar. 5, 2021) (PD 149), Appx1210 (countervailing

---

have data corresponding to the China-wide entity, but the information available indicated that imports attributable to the China-wide entity were likely small. *See* Views at 60 n.245, Appx2344 (citing CR at Table IV-6b, Note, Appx2277). For the countervailing duty investigation, the Commission relied on monthly exports reported by only Zongshen. *See* Views at 60, 66, Appx2344, Appx2350 (citing CR at Tables IV-6a, IV-6b, IV-7a, IV-7b, Appx2276-2277, Appx2279) (supplemental data collection for monthly exports to the United States by foreign producer Zongshen, received February 19, 2021, and Zongshen's affiliate companies (Chongqing Daijing and Ducar), received March 26, 2021).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

duty investigation). The Commission estimated that Zongshen
accounted for [          ] of total reported exports from China to the
United States in 2019. *See* CR at Table VII-1, Appx2235. Thus, it was
reasonable for the Commission to rely on monthly export data as
reported by Zongshen and its affiliates in the antidumping duty
investigation, and as reported by Zongshen in the countervailing duty
investigation, as these data were available and most closely resembled
those imports subject to Commerce's critical circumstances
determinations.

The Commission's use of monthly export data in this case, as a proxy
for imports, was also reasonable considering that MTD had reported
that lead times for imports in 2020 varied widely because of shipment
disruptions related to COVID-19. *See* Views at 59 n.241, Appx2343
(citing CR at II-17-18, Appx2129-2130)*; see also* MTD's Posthr'g Br. at
Ex. 1, at 42 (CD 185), Appx2032. Given that lead times for imports
varied widely in 2020, which covered most of the pre-petition period and
all of the post-petition period, it was reasonable for the Commission to
rely on export data, as export data was not as subject to variability in
shipment times and, therefore, was a more comparable and reliable

data source for evaluating the timing and volume of any post-petition increases.

Furthermore, the Commission's selection of five-month pre- and post-petition periods, and its inclusion of the full month of March in the pre-petition period, when the petitions were filed on March 18, 2020, and the full month of August in the post-petition period, when provisional duties were first imposed on August 24, 2020, was reasonable for several reasons. First, as it did in these investigations, the Commission typically collects data on a monthly basis for purposes of addressing critical circumstances. *See, e.g.*, *Large Vertical Shaft Engines from China*, Inv. Nos. 701-TA-637 and 731-TA-1471 (Final), USITC Pub. 5162, at Tables IV-3, IV-4 (Feb. 2021) (showing official U.S. import statistics on a monthly basis for the purpose of analyzing critical circumstances). Thus, the best information available to the Commission was data on a monthly basis.

Moreover, the Commission's selection of the ending months for the pre- and post-petition comparison periods, when the dates when the petitions were filed and when provisional duties were first imposed fell toward the middle or latter half of the month, was consistent with the

approach it has used in previous investigations, including in a recent case involving similar products. *See id.* at 39-40 & nn.214, 216 (pre-petition period included January 2020, when petitions were filed on January 15, 2020, and post-petition period included June 2020, when Commerce published its initial preliminary determination on June 19, 2020). As the petitions were filed on March 18, 2020, towards the latter half of March, it was reasonable to include monthly data for March in the pre-petition period and, as provisional duties were first imposed on August 24, 2020, towards the latter half of August, it was reasonable to include monthly data for August in the post-petition period.

Additionally, the specific facts of the SVSEs investigations lend themselves to the inclusion of export shipments immediately after the filing of the petitions in the pre-petition period and those shipments immediately after the imposition of provisional duties in the post-petition period. As discussed above, MTD itself reported that there are historically long lead times of 90 to 120 days from order to delivery of its SVSEs from China. *See* Views at 59 n.241, Appx2343 (citing CR at II-17-18, Appx2129-2130); *see also* MTD's Posthr'g Br. at Ex. 1, at 42 (CD 185), Appx2032. These long lead times would, logically, include a

36

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

shorter amount of time from order to export. The Commission's selected timeframes at least partially account for this lag in time. Moreover, as the massive surge in export volumes occurred in April through July 2020, inclusion or exclusion of consideration of export volumes in March or August would have no effect on the Commission's analysis. *See* CR at Tables IV-6a and IV-6b, Appx2276-2277. Thus, the Commission's methodology was reasonable. *See JMC Steel Grp.*, 70 F. Supp. 3d at 1316 n.4 ("{T}he court will affirm the chosen methodology as long as it is reasonable.").

Using this reasonable methodology for comparing pre- and post-petition periods, the Commission found that the volume of cumulative monthly exports in the post-petition period "increased sharply" as compared to the volume of cumulative monthly exports in the comparable (five-month) pre-petition period, in both the antidumping and countervailing duty investigations. Views at 62, 67-68, Appx2346, Appx2351-2352. These findings are supported by substantial evidence. For the antidumping duty investigation, Table IV-6b shows that the volume of cumulative monthly exports to the United States by Zongshen and its affiliates rose from [ ████████ ] units in the pre-petition

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

period to [          ] units in the post-petition period, for an increase of

[          ] percent. *See* Views at 60, Appx2344 (citing CR at Table IV-6b,

Appx2277). For the countervailing duty investigation, Table IV-6a

shows that the volume of cumulative monthly exports to the United

States by Zongshen rose from [          ] units in the pre-petition period

to [          ] units in the post-petition period, for an increase of [          ]

percent. *See* Views at 66, Appx2350 (citing CR at Table IV-6a,

Appx2276). Tables IV-6a and IV-6b, as well as Table F-1, further

demonstrate that the volume of cumulative monthly exports in the post-

petition period comprised [       ] percent and [       ] percent, respectively,

of total apparent U.S. consumption during interim 2020 (January

through September 2020) and that the volume increased despite total

apparent U.S. consumption being lower in interim 2020 as compared to

the same period in 2019. *See* Views at 61-62, 66, 68, Appx2345-2346,

Appx2350, Appx2352 (citing CR at Tables IV-6a, IV-6b, C-1, F-1,

Appx2276-2277, Appx2257-2258, Appx2269).

Furthermore, the Commission's finding that monthly exports subject

to Commerce's affirmative critical circumstances determinations

showed a different pattern in 2020, as compared to prior years in the

POI, was likewise supported by substantial evidence. As Tables IV-7a and IV-7b demonstrate, in 2020, monthly exports were at their highest levels during the spring and summer months, or April to July 2020. In prior years, however, monthly exports were at their highest levels during the winter and fall months, or January through March and September through November, and they were at relatively low levels during the spring and summer months, or April through July, consistent with seasonal demand by OEMs for SVSEs in advance of the spring and summer months when demand for lawn mowers is highest. *See* Views at 23, 61-62, 67-68, Appx2307, Appx2345-2346, Appx2351-2352 (citing CR at II-1, Tables IV-7a, IV-7b, Figures IV-5a, IV-5b, Appx2113, Appx2279-2280).

> ### 2. *The Commission's findings regarding the rapid increase in inventories of imports are supported by substantial evidence and in accordance with law.*

In addressing the rapid increase in inventories of imports subject to Commerce's affirmative critical circumstances determinations, the Commission reasonably relied on the best facts available. Unlike with export data, the Commission did not have inventory data available on a monthly basis, but it did have inventory data available on an end of

year and end of interim period basis. Thus, the Commission relied on reported end of 2019 (December 2019) inventories to estimate end of pre-petition period inventories and relied on reported end of interim 2020 (September 2020) inventories to estimate end of post-petition period inventories. *See* Views at 61 n.249, 67 n.271, Appx2345, Appx2351. As interim 2020 ended in September 2020, it was only one month removed from August 2020, when the pre-petition period ended.

Additionally, specific to the facts of the SVSEs investigations, it was reasonable for the Commission to consider end of September 2020 inventories because, as discussed above, MTD reported that there were historically long lead times for imports in 2020. *See* Views at 59, n.241, Appx2343 (citing CR at II-17-18, Appx2129-2130); *see also* MTD's Posthr'g Br. at Ex. 1, at 42 (CD 185), Appx2032. Given the lag between placing orders, shipments, and the actual arrival of imports into warehouses where they will be counted in inventory, it made sense for the Commission to include an additional month after provisional duties were imposed. This allowed the Commission to more accurately capture U.S. importers' inventory data that included imports of SVSEs from

40

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Zongshen and its affiliates that were ordered prior to provisional duties being imposed.

Based on its analysis of the data, the Commission found that the sharp increases in monthly exports subject to Commerce's affirmative critical circumstances determinations created a subsequent large stockpile of subject import inventories. *See* Views at 64, 69, Appx2348, Appx2353. As Table IV-8 showed, end of September 2020 subject import inventories were [███] percent higher at [█████] units than end of December 2019 inventories at [████]. Views at 61, 67, Appx2345, Appx2351 (citing CR at Table IV-8, Appx2179). The Commission also observed that the ending inventories of imports subject to Commerce's affirmative critical circumstances determinations in September 2020 were larger than all U.S. importers' end-of-year inventories of subject merchandise in each year from 2017 through 2019. *See* Views at 64, 69, Appx2348, Appx2353 (citing CR at Tables IV-8, C-1, Appx2179, Appx2257-2258). As the Commission further explained, the volume of end of September 2020 inventories, which totaled [█████] units, was a large volume of SVSEs compared to Zongshen's annual exports to the United States, which were [████] units in 2017, [█████] units in

41

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

2018, and [███████] units in 2019. *See* Views at 64-65, 69, Appx2348-2349, Appx2353 (citing CR at Table IV-8, Appx2179); *see also* Zongshen's Foreign Producer Questionnaire Response, at II-8 (CD 124), Appx1307-1309.

Moreover, contrary to Plaintiff's claim, *see* Pl.Br. at 17, the Commission considered seasonality issues by comparing September 2020 inventory levels to those at the same point in the prior year. The Commission found that end of September 2020 subject import inventories were [█████] percent higher at [███████] units than end of September 2019 inventories at [███████] units. Views at 61 n.249, 67 n.271, Appx2345, Appx2351 (citing CR at Table IV-9, Appx2179). Such a September 2019 to a September 2020 comparison eliminates any seasonality concerns of a comparison between December 2019 inventories and September 2020 inventories. This comparison of the same month data from year-to-year showed an even larger increase in inventories of subject imports in 2020 as compared to 2019 than when

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

looking at end-of-period inventories for December 2019 and September 2020.[10]

Also supported by substantial evidence was the Commission's finding that the surge in monthly exports subject to Commerce's affirmative critical circumstances determinations and subsequent substantial buildup in subject import inventories meant that MTD had less need to buy SVSEs from domestic producers for the 2021 outdoor power equipment season. *See* Views at 65, 69-70, Appx2349, 2353-2354. The record shows that SVSE manufacturers (*e.g.*, Briggs & Stratton and Zongshen) typically engaged in price negotiations with OEMs (*e.g.*, MTD) in the spring and summer for SVSEs to be delivered in the fall and winter for the following year's lawn mower season. *See* Views at 30, Appx2314 (citing CR at V-4-6, Appx2186-2188). However, as discussed above, there were large monthly exports subject to Commerce's affirmative critical circumstances determinations in the spring and summer months of 2020, which exhibited a different pattern from that

---

[10] End of September 2020 subject import inventories were [ ] percent higher than end of September 2019 inventories, while end of September 2020 inventories were [ ] percent higher than end of December 2019 inventories. *See* Views at 61 & n.249, 67 & n.271, Appx2345, Appx2351 (citing CR at Tables IV-8, IV-9, Appx2179).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

of prior years when monthly exports were at their highest levels in the winter and fall months. *See* Views at 61-62, 67-68, Appx2345-2346, Appx2351-2352 (citing CR at Tables IV-7a, IV-7b, Appx2279). Hence, the large monthly exports of SVSEs in the spring and summer of 2020, and subsequent inventory buildup by MTD, served as a disincentive for MTD to obtain additional SVSEs from Briggs & Stratton for the 2021 outdoor power equipment season. *See* Views at 65 n. 266, 70 n.285, Appx2349, Appx2354.

In light of MTD's disincentive to obtain additional SVSEs from the domestic industry, as well as the significant underselling by subject imports and the [          ] performance of the domestic industry in interim (January through September) 2020, the Commission reasonably determined that the massive surge of monthly exports subject to Commerce's affirmative critical circumstances determinations, and rapid subject import inventory buildup, were likely to protract the adverse impact of such imports on the domestic industry, and thereby undermine seriously the remedial effect of the antidumping and countervailing duty orders. Thus, the Commission's final affirmative

critical circumstances determinations was supported by substantial evidence. Views at 65-66, 70, Appx2349-2350, Appx2354.

### C. Plaintiff's challenges to the Commission's affirmative critical circumstances determinations are unavailing.

#### 1. The Commission's data inclusion period was reasonable.

As discussed above, the facts in this record support the Commission's reliance on the data it included in its analysis, including data for the first two weeks of March 2020 in the pre-petition period and for the last week of August 2020 in the post-petition period. Plaintiff's contention otherwise, *see* Pl. Br. at 11, is simply incorrect, and overlooks that the Commission has the discretion to apply any methodology that is reasonable under the facts of the case. *See JMC Steel Grp.*, 70 F. Supp. 3d at 1316 n.4.

#### 2. The Commission's reliance on export data to measure the timing and the volume of imports was reasonable and in accordance with the law.

As discussed above, the Commission reasonably relied on monthly export data to measure the timing and volume of imports. The reasonableness of that approach is not disturbed by Plaintiff's allegation that the Commission improperly analyzed export data "representing imports which entered after provisional measures were

45

imposed." Pl. Br. at 14. This, Plaintiff claims, is contrary to the directive in the SAA to analyze "the surge in imports prior to the suspension of liquidation" or "prior to the effective date of relief." *See* Pl. Br. at 12-14 (quoting SAA, H.R. Rep. 103-316, vol. I at 877 (emphasis omitted)).

As a legal matter, the Commission's understanding of the statute – as expecting the Commission to consider imports that were in transit prior to the imposition of provisional duties – is certainly reasonable and consistent with the statutory language and legislative intent. The statute directs the Commission to consider "the timing . . . of the imports," 19 U.S.C. §§ 1671d(b)(4)(A)(ii)(I), 1673d(b)(4)(A)(ii)(I), and it is reasonable to interpret this language as permitting the Commission to consider several key points along the timeline of an import – such as order date, shipment date, export date, date of importation, or delivery date – as would be relevant under the circumstances of any particular investigation. Moreover, the remainder of the statute clearly permits a wide range of flexibility in the Commission's critical circumstances analysis, as one of the factors that the Commission is to consider is "*any other such circumstances* indicating that the remedial effect of the {orders} will be seriously undermined," and the Commission is

46

permitted to consider the three enumerated factors, "*among other factors it considers relevant.*" *See id.* at §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii) (emphasis added). Here, the Commission reasonably used export data from the producers subject to Commerce's affirmative critical circumstances determination as the most accurate and reliable information available and due to wide variations in shipment times in 2020 due to effects of the COVID-19 pandemic. *See* Views at 59-60, 66, Appx2343-2344, Appx2350.

Plaintiff also ignores the fact that the legislative history for the critical circumstances provision indicates that it was designed "to deter *exporters* whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their *exports* to the United States during the period between initiation of an investigation and a preliminary determination by {Commerce}." *ICC Indus., Inc.,* 812 F.2d at 699-700 (emphasis added) (quoting H.R. Rep. No. 96-317 at 63). Furthermore, the SAA, which is "an authoritative expression by the United States concerning the interpretation and application" of the statute, 19 U.S.C. § 3512(d), references both a "surge in imports" as well as the more generic term "shipments," stating that a critical

circumstances determination is focused "on whether an order's effectiveness is undermined by increasing *shipments* prior to the effective date of the order." H.R. Rep. 103-316, vol. I at 877 (emphasis added).

Considering both the statutory language in context, and this explicit legislative history, it was perfectly consistent with the statute for the Commission to consider the increase in exports subject to Commerce's affirmative critical circumstances determinations during the period between the filing of the petitions and Commerce's initial preliminary determination first imposing provisional duties. Accordingly, the Commission's use of export data was in accordance with law.

Moreover, as a factual matter, and as previously described, the Commission's use of export data in this case, as a proxy for imports, was reasonable because it was the most accurate data available for measuring the timing and volume of imports subject to Commerce's affirmative critical circumstances determinations, as not all actual imports of subject merchandise were subject to Commerce's affirmative critical circumstances determinations. It was also reasonable

considering that lead times for imports varied widely in 2020 and export data was not subject to variability in shipment times.

In its prehearing report, Commission staff included a table with monthly official U.S. import statistics for the Harmonized Tariff Schedule statistical reporting number that most closely resembled the scope of the antidumping and countervailing duty investigations. *See* Prehr'g Rept. at Table IV-6 (PD 115), Appx2623. While not all official U.S. imports from China were subject to Commerce's affirmative critical circumstances determinations, nonetheless, consistent with differences in timing between exports and imports and variations in shipment times, the official U.S. import data show an increase in imports from 60,221 units in May 2020 to 167,423 units in June 2020, followed by an increase from 98,286 units in July 2020 to 331,372 units in August 2020 – by far the largest monthly volume of imports from China during the entire POI. *See id.* (PD 115), Appx2623.  After August 2020, monthly volumes of imports sharply decreased. Monthly imports reported under the HTS number for the remainder of 2020 were 15,631 units in September 2020, 35,198 units in October 2020, 23,609 units in November 2020, and 7,128 units in December 2020, the smallest

49

monthly volumes of 2020. *See id.* (PD 115), Appx2623. The fact that

there were large volumes of imports of SVSEs from China entering the

United States in the post-petition period through August 2020 – the

final month of the post-petition period – and not thereafter corroborates

the Commission's finding that the timing and the volume of the exports

subject to Commerce's affirmative critical circumstances determinations

served to undermine seriously the remedial effect of the antidumping

and countervailing duty orders.

   In any event, Plaintiff fails to recognize that the Commission's

reliance on export data in this case was actually favorable to MTD's

position. Hence, at best, any error Plaintiff can cite to would be

harmless. *See CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337,

1353–54 (Ct. Int'l Trade 2014) (holding that any error in the

Commission's analysis of post-petition effects would have been harmless

because discounting post-petition data would not have changed its

ultimate finding of no material injury) (citing *U.S. Steel Grp.*, 96 F.3d at

1367).

   As Plaintiff argues, given the historical 90-120 day lead time for

imports, the end of the post-petition period likely covered some exports

50

to the United States that would have been imported after August 24, 2020 and, therefore, would have been subject to provisional duties. *See* Pl. Br. at 13-14. It would not be unexpected, however, for exports to decrease in volume as the date that provisional duties are imposed approaches. This appears to be true, here, where monthly exports subject to Commerce's affirmative critical circumstances determinations dropped precipitously in August 2020, which is the month when provisional duties were imposed. *See* CR at Tables IV-7a, IV-7b, Appx2279.

Hence, the Commission's reliance on export data in this case, and its inclusion of August 2020 in the post-petition period, meant that the post-petition period included at least one month when exports were likely lower due to impending provisional duties. This was helpful to MTD's position because, when the Commission compared pre- and post-petition period cumulative export volumes, the cumulative volume in the post-petition period was lower than it otherwise could have been due to the inclusion of August 2020 exports. Nevertheless, even considering, as it did, a data source and comparison periods favorable to MTD, the Commission still found that cumulative monthly exports in

51

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

the post-petition period increased sharply as compared to cumulative monthly exports in the pre-petition period and that the volumes associated with the increases were large.[11]

Finally, Plaintiff ignores the fact that the Commission did not rely solely on export data in its critical circumstances analysis, as it relied on *import* data in its analysis of the rapid increase of inventories of imports subject to Commerce's affirmative critical circumstances determinations. As discussed, in addressing the rapid increase in inventories of imports, the Commission based its data on end-of-period U.S. inventories of imported SVSEs from Zongshen as reported by U.S. importers [███] and the [███████]. *See* Views at 65 n.263, 69 n.282, Appx2349, Appx2353 (citing CR at Tables IV-8 and IV-9, Appx2179).

---

[11] Had the Commission considered shorter four month pre- and post-petition periods (December 2019 through March 2020 and April through July 2020), in light of Plaintiff's argument that exports during the longer five-month post-petition period could have been subject to provisional duties, such an analysis would have shown even larger cumulative export volume increases of [███] and [███] percent in the antidumping and countervailing duty investigations, respectively. *See* CR at Tables IV-6a and IV-6b, Appx2276-2277.

### 3. The cases that Plaintiff cites are not inconsistent with the Commission's timing and volume analysis in this case.

Plaintiff's reliance upon other cases where the Commission addressed the issue of critical circumstances is unavailing and does not render the Commission's affirmative critical circumstances determinations unsupported by substantial evidence. *See* Pl. Br. at 9-10. For example, Plaintiff cites *Potassium Permanganate from China*, Inv. No. 731-TA-125 (Final), USITC Pub. 1480 (Jan. 1984) and *Synthetic Indigo from China*, Inv. No. 731-TA-851 (Final), USITC Pub. 3310 (June 2000), where subject imports increased by more than 650 percent and by more than 300 percent, respectively, in the post-petition period as compared to the pre-petition period as cases in which the Commission made affirmative critical circumstances determinations. *See* Pl. Br. at 9-10. Plaintiff also cites *Utility Scale Wind Towers from Canada, Indonesia, Korea, and Vietnam*, Inv. Nos. 701-TA-627-629 and 731-TA-1458-1461 (Final), USITC Pub. 5101 (Aug. 2020) and *Large Vertical Shaft Engines from China*, USITC Pub. No. 5162, as examples of cases where the Commission made negative critical circumstances

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

determinations despite increases in subject import volumes between pre- and post- petition periods. *See* Pl. Br. at 16-17.

As an initial matter, Plaintiff overlooks that each investigation is *sui generis* and dependent on the facts unique to the particular record. *See Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007) (noting that each injury investigation by the Commission is *sui generis* and, "{f}or that reason, prior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries"); *see also Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1255 (Ct. Int'l Trade 2016). Plaintiff also fails to recognize that the Commission has made affirmative critical circumstances determinations in cases with lower increases between pre- and post-petition periods. *See, e.g., Honey from Argentina and China*, Inv. Nos. 701-TA-402 and 731-TA-892-893 (Final), USITC Pub. 3470, at 22-24 (Nov. 2001) (subject imports increased by 78.5 percent in the post-petition period as compared to the pre-petition period).

In this case, the Commission found increases in exports subject to Commerce's critical circumstances determinations of [■■■■] percent in

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

the antidumping duty investigation and [＿＿] percent in the
countervailing duty investigation, which are large increases, especially
in the context of the different seasonal monthly export trends exhibited
in the post-petition period than which typically occurs, and are
consistent with the SSA's directive to examine massive increases. *See*
Views at 60-62, 67-68, Appx2344-2346, Appx2351-2352. Moreover, the
Commission did not rely solely on the percentage increases but also
considered the volumes associated with those increases in absolute
terms and relative to consumption, noting, for example, that the
volumes associated comprised [＿＿] and [＿＿] percent of total apparent
U.S. consumption during interim 2020 (January to September 2020).
*See* Views at 61, 66, Appx2345, Appx2350 (citing CR at Tables IV-6a,
IV-6b, F-1, Appx2276-2277, Appx2269).

> *4.  The Commission's reliance on end of December 2019
> and end of September 2020 inventories to measure the
> rapid increase in inventories of imports was consistent
> with its practice and reasonable.*

With respect to inventories, Plaintiff points out that the end-of-
period inventories that the Commission relied upon to measure the
rapid increase in U.S. inventories of imports subject to Commerce's
critical circumstances determinations did not precisely align with the

55

pre- and post-petition periods. *See* Pl. Br. at 17. The Commission

explicitly acknowledged in its Views that "{a}vailable inventory data do

not correspond to the comparison periods." Views at 61, n.249,

Appx2345. But, as explained above, such data were the best facts

available on the record, and the Commission, therefore, reasonably used

end of 2019 (December 2019) inventories to estimate end of pre-petition

period inventories and end of interim 2020 (September 2020)

inventories to estimate end of post-petition period inventories. *See*

Views at 61 n.249, 67 n.271, Appx2345, Appx2351.[12] The Commission

also compared ending inventories in interim 2019 (September 2019) and

interim 2020 (September 2020) in order to take seasonal trends into

account. *See* Views at 61 n.249, 67 n.271, Appx2345, Appx2351 (citing

CR at Table IV-9, Appx2179).

Furthermore, as previously described, as a factual matter, it was

reasonable for the Commission to consider end of September 2020

---

[12] As noted earlier, while each investigation is *sui generis*, the Commission's
approach for estimating the end of pre- and post-petition inventories was consistent
with the method the Commission used in its critical circumstances analysis in the
*Large Vertical Shaft Engines* investigation. USITC Pub. 5162 at 40 & n.218 (using
end of 2019 inventories and end of interim 2020 inventories, which did not
correspond precisely to the pre- and post-petition periods ending in January 2020
and June 2020, respectively).

inventories since MTD reported that there were historically long lead times for imports in 2020. *See* Views at 59, n.241, Appx2343 (citing CR at II-17-18, Appx2129-2130); *see also* MTD's Posthr'g Br. at Ex. 1, at 42 (CD 185), Appx2032. Given the lag between placing orders, shipments, and the actual arrival of imports into warehouses where they will be counted in inventory, it was reasonable for the Commission to include an additional month after provisional duties were imposed in order to properly account for those imports of SVSEs from Zongshen and its affiliates in U.S. importers' inventories that were ordered prior to provisional duties being imposed.

### D. The Commission properly considered and addressed Plaintiff's remaining arguments and its conclusions were supported by substantial evidence and in accordance with the law.

Plaintiff urges this Court to second-guess the Commission and substitute Plaintiff's preferred findings for those of the Commission. Specifically, Plaintiff repeats many arguments that it already put forth before the Commission, and which the Commission reasonably rejected. The Commission carefully considered each of MTD's arguments and articulated the basis for its reasoning and conclusions. As such, the

Court should sustain the Commission's findings and decline to reweigh the evidence.

>    1. *The Commission considered and reasonably rejected Plaintiff's argument that certain exports made during the post-petition period were ordered during the pre-petition period.*

Plaintiff argues that a "substantial portion" of the exports reflected in the post-petition period were actually ordered prior to the filing of the petitions. According to Plaintiff, the high level of monthly post-petition exports from April to July 2020 merely reflected a backlog of orders that were made prior to the petitions, when Chinese production was shutdown (from late January to March 2020) due to COVID-19. *See* Pl. Br. at 14-15.

As the Commission explained, the facts in the record contradicted the factual predicate of MTD's argument. First, as Plaintiff acknowledges, the Commission observed that exports in January through March 2020, during the pre-petition period when Chinese production was shut down due to COVID-19, were actually higher than during the same January through March period in 2019. *See* Views at 62-63, 68 n. 277, Appx2346-2347, Appx2352 (citing CR at Tables IV-7a, IV-7b, Appx2279)*; see also* Pl. Br at 15. Given this fact, the Commission

reasonably found that any shutdown of Chinese production during the January to March 2020 period did not appear to have affected the Chinese producers' ability to export. *See* Views at 62-63, Appx2346-2347.

Plaintiff now claims that this "assumption" ignores commercial realities and "numerous extraneous economic factors impacting the year-over-year U.S.-China trade environment during this period." Pl. Br. at 15. Of course, there are always variable conditions in any of the Commission's year-over-year comparisons, which is precisely why the Commission strives to find the most consistent and reliable data source for year-over-year comparisons, as well as why the Commission considers the conditions of competition that exist in the U.S. market during the POI as context for any year-over-year changes.

Indeed, in this case, the Commission considered export data in its critical circumstances analysis precisely because it was reliable, consistent, and not subject to the variable shipment times of import data. Moreover, the Commission considered the conditions of competition that existed in the U.S. market for SVSEs throughout the POI, including the effect that such extraneous factors as COVID-19 and

section 301 tariffs had on supply and demand conditions. *See* Views at 22-31, Appx2306-2315. The Commission also considered the fact that total exports subject to Commerce's affirmative critical circumstances determinations in January through March 2020 were higher than during the same period in 2019, despite the fact that total apparent consumption of SVSEs in the U.S. market in interim 2020 (January to September 2020) was lower than during the same period in 2019 (January to September 2019). *See* Views at 25, Appx2309. Plaintiff is correct that the critical circumstances examination should not occur in "a vacuum," yet Plaintiff completely ignores that the Commission only reached the issue of critical circumstances after it made affirmative material injury determinations upon examination of data reflecting the entire three- and three-quarters-of-a-year POI.

Moreover, contrary to Plaintiff's claim that this "assumption in fact forms the only basis on which the Commission rests its conclusions," the Commission did not rest its conclusion solely on this one fact – that Chinese producers exported more SVSEs during January to March 2020 than during the same period in 2019. *See* Pl. Br. at 15. Rather, the Commission also observed that MTD acknowledged in its posthearing

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

brief that it placed orders with Zongshen after the petitions were filed "through spring 2020," and that these orders began arriving as imports in July and August 2020. *See* Views at 63, Appx2347 (citing MTD's Posthr'g Brief at 13 (CD 185), Appx1986). It was reasonable for the Commission to conclude from such an admission that orders made during the post-petition period were, in fact, also exported (and imported) during the post-petition period.

Furthermore, the Commission emphasized that the largest monthly export volumes and increases in exports to the United States from Zongshen came in June and July 2020, which was late in the post-petition period and well after MTD asserted Zongshen reopened in March. *See* Views at 68-69, Appx2352-2353. The Commission also noted that the monthly export volumes in both June and July 2020 were higher than any other month in the pre-petition period and were the largest monthly export volumes throughout the entire POI and that the export volumes in April through July 2020 were [          ] total annual export volumes from 2017 to 2019, suggesting that the large amounts of exports during these months could not reasonably be explained as simply a catch up on a backlog of orders made during the

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

pre-petition period. *See* Views at 63-64 & n. 258, 68-69 & n.278,

Appx2347-2348, Appx2352-2353 (citing CR at Tables IV-7a, IV-7b,

Appx2279).[13]

> 2. *The Commission considered and reasonably rejected Plaintiff's argument that commercial uncertainties surrounding the domestic industry's ability to supply U.S. demand during the post-petition period explained the increase in export volume during this period.*

Plaintiff also argues that the COVID-related Chinese plant closures

and reopenings coincided with reported commercial uncertainties

concerning the domestic industry's ability to meet ongoing demand. Pl.

Br. at 18.

As the Commission explained in its Views, the evidence on the record

indicated that the exports from Zongshen and its affiliates were made

at a time when Briggs & Stratton was meeting MTD's demand forecasts

and MTD was continuing to seek out supply agreements with Briggs &

Stratton. Views at 51-52 & n.215, Appx2335-2336. This evidence belied

---

[13] As Commissioner Johanson likewise acknowledged in his separate views on critical circumstances, "{e}ven accounting for the lower-than-normal subject {export} volumes for February and March 2020, the figure of [███████] additional units in April to August 2020 {as compared to cumulative monthly exports over the five months prior to the filing of the petitions} is far higher than the apparent shortfalls for those two months {February and March 2020}." Separate Views of Comm'r David S. Johanson, at 3 (CD 212), Appx2358.

MTD's assertions that its alleged concerns regarding Briggs &
Stratton's continued viability accounted for the large increases in
monthly exports from Zongshen. *See* Views at 64, Appx2348. As the
Commission described earlier in the Views, at least until July 2020,
which was well into the post-petition period, Briggs & Stratton was
meeting MTD's forecasted demand for SVSEs. Views at 51, Appx2335.
This finding in turn was based on substantial record evidence,
specifically evidence indicating that Briggs & Stratton had met MTD's
May through July 2020 demand forecasts for SVSEs needed from June
to September 2020. *See* Views at 51 n.215, Appx2335 (citing MTD's
Posthr'g Br. at Ex. 1, at 39 (CD 185), Appx2029, Briggs & Stratton's
Posthr'g Br. at 14-15, Ex. 1 at 51-53, Ex. 4 at 4 (CD 183), Appx1658-
1659, Appx1712-1714, Appx1768). Further, the evidence supports the
Commission's finding that "any shortfall in meeting {MTD's} revised
August forecasts {did} not reflect an inability of Briggs & Stratton to
supply the market but rather reflect{ed} a disconnect between projected
and actual volumes required by MTD and the need for some advance
planning to be able to secure the workers and materials to produce

increasing quantities of engines." Views at 51 n.215, Appx2335; *see also* Briggs & Stratton's Posthr'g Br. at Ex. 1 at 53, (CD 183), Appx1714.

In addition, the record showed that the domestic industry as a whole, and Briggs & Stratton itself, suffered declining revenues prior to the filing of the petitions. *See* Views at 46-48, Appx2330-2332 (citing Tables VI-1, C-1, Appx2215-2216, Appx2257-2258); *see also* Briggs & Stratton's U.S. Producer Questionnaire Response at III-9a (CD 136) Appx1393. As the Commission reasonably found in reaching its uncontested finding of present material injury, the industry's poor financial performance during the POI was caused by the subject imports in the first place. *See* Views at 47-49, Appx2331-2333. In the context of the statutory purpose to give relief to a domestic industry that is materially injured by reason of unfairly trade imports, it is reasonable for the Commission to decline to credit an importer's concerns about the industry's continued viability when the imports have been a cause of the industry's poor performance.

Here, as the Commission found, and the evidence showed, Briggs & Stratton's declining revenues and financial performance, which led MTD to question the firm's continued viability, resulted, in part, from subject import competition. *See* Views at 62 n.253, 68 n.276, Appx2346,

Appx2352. As such, the Commission reasonably placed in perspective

MTD's reliance on its perceptions of Briggs & Stratton's poor financial

condition as justification for increasing its orders of subject imports.

Contrary to MTD's circular view that the commercial uncertainties

surrounding the import-caused suffering of the domestic industry

should foreclose a finding of critical circumstances, the Commission

reasonably found that the effect of MTD's increased imports would be to

continue to injure the domestic industry and to undermine seriously the

remedial effect of the antidumping and countervailing duty orders. *See*

Views at 48-49, 62 n.253, 68 n.276, Appx2332-2333, Appx2346,

Appx2352. In other words, MTD cannot fall back on commercial

uncertainties that it allegedly perceived with respect to the domestic

industry's ability to supply SVSEs, when its purchases of subject

imports during the POI were a reason why the commercial

uncertainties existed in the first instance.

>    3.  *The Commission considered and reasonably rejected*
>        *Plaintiff's argument that the remedial effect of the*
>        *orders was not undermined seriously because MTD*
>        *imported custom-made SVSEs.*

Plaintiff again argues here that because MTD's engines were custom-

made by Zongshen specifically for MTD-manufactured outdoor power

equipment, these imports were not stockpiled for resale in the U.S. market, and therefore could not have competed for sales with the domestic industry's SVSEs after provisional duties were in place. *See* Pl. Br. at 21-23. This argument is a red herring. The record unequivocally shows that domestic producer Briggs & Stratton was capable of, and did in fact, produce SVSEs that were selected for MTD's particular mower platforms. *See* Views at 29 & n.113, 30, Appx2313-2314 (citing CR at II-2 & n.7, II-21, Appx2114, Appx2133) (MTD purchased SVSEs both from Briggs & Stratton and Zongshen).

As the Commission explained in the Views, however, while MTD would not typically resell SVSEs that it maintained in its inventories, the additional inventories of imported SVSEs nonetheless represented orders that the domestic industry did not have an opportunity to obtain. *See* Views at 65 n.266, 70 n.285, Appx2349, Appx2354. In particular, in discussing the conditions of competition – which formed the backdrop for the whole of the Commission's Views – the Commission found that U.S. and subject engine suppliers compete for their engines to be selected with respect to the same sales to OEMs, with MTD purchasing SVSEs both from U.S. producers and Zongshen for its particular mower

platforms. *See* Views at 29 & n.113, Appx2313 (citing CR at II-2 & n.7, Appx2114). In fact, as Plaintiff acknowledges, MTD purchased more than three times as many engines from Briggs & Stratton than from Chinese producers over the POI. Pl. Br. at 26.

Further, as the Commission explained, the sharp increase in monthly exports prior to provisional duties being imposed, and subsequent rapid inventory buildup, meant that MTD had less need to purchase SVSEs from domestic suppliers for the following year's lawn mower season. *See* Views at 65, 69-70, Appx2349, Appx2353-2354. In this regard, the Commission observed that, in 2020, monthly exports subject to Commerce's affirmative critical circumstances determinations, unlike in prior years, were largely exported in the spring and summer months (April to July 2020). *See* Views at 61-62, 67-68, Appx2345-2346, Appx2351-2352 (citing CR at Tables IV-7a, IV-7b, Appx2279). This was exactly when price negotiations between SVSE manufacturers, like Briggs & Stratton, and OEMs, like MTD, would typically be taking place for SVSEs to be delivered over the fall and winter for the following year's lawn mower season. *See* Views at 30, Appx2314 (citing CR at V-4-6, Appx2186-2188).

67

In the end, the additional inventories of imported SVSEs held by MTD were orders that the domestic producers (who likewise manufactured and sold SVSEs to MTD) did not have an opportunity to obtain.

> ### 4. The Commission considered and reasonably rejected Plaintiff's argument that the remedial effect of the orders was not undermined seriously because the domestic industry's condition improved after provisional duties were imposed.

Finally, Plaintiff argues that the domestic industry's condition improved after provisional duties went into effect, as subject imports subsided, purchases of domestically produced SVSEs increased, and MTD entered into a new supply agreement with Briggs & Stratton that included significant price increases. *See* Pl. Br. at 23-27.[14]

---

[14] Plaintiff's reliance on Commissioner Johanson's separate views in support of these arguments is misplaced. That the dissenting Commissioner, or this Court, or Plaintiff, may have weighed the evidence differently, does not provide grounds to overrule the Commission's determination. Indeed, "{a}lthough individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Siemens Energy, Inc. v. United States,* 806 F. 3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence.") (citing *Consolo*, 383 U.S. at 619-20).

As the Commission found in the Views, however, while both MTD and Toro had entered into new supply agreements with domestic producers in late 2020, these contracts were not for a fixed number of units. *See* Views at 65 n.266, 70 n.285, Appx2349, Appx2354 (citing Briggs & Stratton's Posthr'g Br. at Ex. 4, para. 49, (CD 183), Appx1778). Moreover, the new supply agreements did not diminish the impact of the especially high volumes of monthly exports subject to Commerce's affirmative critical circumstances determinations and the subsequent inventory buildup by MTD, which served to reduce the volume of SVSEs that MTD may have ordered from domestic producers for use in lawn mowers to be sold the following season. *See* Views at 65 n.266, 70 n.285, Appx2349, Appx2354.

As described above, substantial evidence supported the Commission's finding that the surge in exports during the spring and summer of 2020 and subsequent substantial buildup in inventories by MTD meant that MTD had less need to buy SVSEs from domestic producers. *See* Views at 65, 69-70, Appx2349, Appx2353-2354. Hence, any improvement in the domestic industry after provisional duties were imposed does not negate the fact that the post-petition surge in exports, and subsequent

inventory buildup, already had a damaging impact by lessening demand for SVSEs from the domestic industry.

Plaintiff also argues that the Commission "brushed aside" evidence demonstrating that MTD had drawn down most of its import inventory by the fourth quarter of 2020, which contravenes any alleged inventory overhang which might have impacted MTD's future supply needs. *See* Pl. Br. at 17-18, 21. Here again, what MTD did with its inventory of imports *after* the imports had already been timed to beat the provisional duties, is irrelevant. By the fourth quarter of 2020, the massive surge of low-priced exports and subsequent inventory buildup had already occurred during the period when domestic producers and purchasers typically negotiate for the following season.  This had the effect of lessening demand for SVSEs from domestic producers for the following season, thereby, protracting the adverse impact of subject imports on the domestic industry and undermining seriously the remedial effect of the orders.

## V.    CONCLUSION

For all of the foregoing reasons, we respectfully request that the

Court affirm the Commission's affirmative critical circumstances

determinations in these investigations.

Respectfully submitted,

*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for
Litigation

*/s/ Henry N.L. Smith*
Henry N.L. Smith
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3314
Facsimile: (202) 205-3111
henry.smith@usitc.gov

*Attorneys for Defendant United States*
*International Trade Commission*

Dated: December 17, 2021
Final Brief Filed: March 11, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S PUBLIC FINAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD** contains 13,451 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010).

Dated: March 11, 2022          */s/ Henry N.L. Smith*

Henry N.L. Smith
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3314
Facsimile: (202) 205-3111
henry.smith@usitc.gov