**Slip Op. 23-34**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

**Court No. 21-00264**

MTD PRODUCTS INC.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant,*

and

BRIGGS & STRATTON, LLC,

*Defendant-Intervenor.*

Before: M. Miller Baker, Judge

## OPINION

[The court denies Plaintiff's motion for judgment on the agency record and instead grants judgment for Defendant and Defendant-Intervenor.]

Dated: March 16, 2023

*Alex Schaefer*, Crowell & Moring LLP of Washington, DC, argued for Plaintiff. With him on the briefs was *Michael Bowen*.

*Henry N.L. Smith*, Office of the General Counsel, U.S. International Trade Commission of Washington, DC, argued for Defendant. With him on the brief was

*Andrea C. Casson*, Assistant General Counsel for Litigation.

*Cliff Long*, King & Spalding LLP of Washington, DC, argued for Defendant-Intervenor. On the brief for Defendant-Intervenor was *Stephen J. Orava*.

*Baker*, Judge: In this case stemming from antidumping and countervailing duty investigations of small vertical shaft engines from China, a domestic importer challenges the International Trade Commission's finding that a surge in imports shortly before duties took effect warranted retroactive application of such duties. For the reasons set out below, the court sustains the Commission's determination.

I

Under the Tariff Act of 1930, as amended, the Commerce Department ordinarily imposes antidumping and countervailing duties prospectively. *See* 19 C.F.R. § 351.206(a) (explaining that antidumping and countervailing duties normally apply to entries of merchandise "made on or after the date on which the Secretary first imposes provisional measures (most often the date on which notice of an affirmative preliminary determination is published in the Federal Register)"); *see also* 19 U.S.C. §§ 1671b(d)(2)(B) (countervailing duties), 1673b(d)(2)(B) (antidumping duties).

But the statute also contains a procedure allowing for retroactive application of duties in certain situa-

tions. If the petitioner whose allegations sparked the investigation alleges "critical circumstances," the Department must also determine whether "there have been massive imports of the subject merchandise over a relatively short period." 19 U.S.C. §§ 1671d(a)(2) (countervailable subsidies), 1673d(a)(3) (dumping).

If Commerce finds such critical circumstances, the Commission must then determine whether the imports in question "are likely to undermine seriously the remedial effect" of the order to be issued. *Id.* §§ 1671d(b)(4)(A)(i) (countervailable subsidies), 1673d(b)(4)(A)(i) (dumping). In making that determination, the Commission must consider

(I) the timing and volume of the imports,

(II) a rapid increase in inventories of the imports, and

(III) any other circumstances indicating that the remedial effect of the [countervailing or antidumping] duty order will be seriously undermined.

*Id.* §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

If the Commission finds that the surge in imports is likely to undermine the remedial effect of the countervailing duty and antidumping orders, duties may be imposed retroactively. The procedure varies depending on the facts of any given case, but as relevant here,

the duties may apply retroactively "to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on or after 90 days before the date on which suspension of liquidation was first ordered." *Id.* §§ 1671b(e)(2)(A), 1671d(c)(4), 1673b(e)(2)(A), 1673d(c)(4). The mechanism's purpose is to prevent clever importers from circumventing impending antidumping and countervailing duties by rushing in their shipments before the duties take effect. *See* H.R. Rep. 96–317, 96th Cong., 1st Sess. at 63 (1979).

## II

### A

Briggs & Stratton, LLC, is an American producer of "small vertical shaft engines." Such engines are typically used in lawn mowers, pressure washers, and other outdoor power equipment. Appx2306–2307. In 2020, Briggs & Stratton petitioned the Commission and Commerce for relief against alleged Chinese dumping of these engines, which the company asserted injured domestic industry.

In response, the Commission opened both antidumping and countervailing duty investigations to determine whether a domestic industry was injured by imports of such engines from China "that are alleged to be sold in the United States at less than fair value and alleged to be subsidized by the Government of China." *Small Vertical Shaft Engines from China;*

*Institution of Anti-Dumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 85 Fed. Reg. 16,958, 16,958 (ITC Mar. 25, 2020). Commerce likewise found the petition sufficient to justify launching investigations. *Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 85 Fed. Reg. 20,667, 20,667 (Dep't Commerce Apr. 14, 2020); *Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 85 Fed. Reg. 20,670 (Dep't Commerce Apr. 14, 2020). MTD Products Inc., a domestic importer of small vertical shaft engines from China, participated in these proceedings before both agencies.

Shortly after the agencies began the investigations, Briggs & Stratton filed an amended petition alleging that critical circumstances existed. *See Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof from the People's Republic of China: Preliminary Affirmative Determination of Critical Circumstances, in Part, in the Countervailing Duty Investigation*, 85 Fed. Reg. 68,851, 68,851 (Dep't Commerce Oct. 30, 2020) (discussing Briggs & Stratton's critical circumstances allegation).

## B

In both the antidumping and countervailing duty investigations, Commerce preliminarily found critical

circumstances existed as to imports of certain (but not all) small vertical engines from China. *Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof, from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, and Preliminary Affirmative Determination of Critical Circumstances, in Part*, 85 Fed. Reg. 66,932, 66,933 (Dep't Commerce Oct. 21, 2020) (antidumping duty); 85 Fed. Reg. at 68,851–52 (countervailing duty).

In its final determinations, Commerce continued to find that critical circumstances existed for imports of small vertical engines from a group of related entities known as the "Zongshen Companies" (collectively, Zongshen) and, in the antidumping duty investigation, for the China-wide entity.[1] *Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof, from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 86 Fed. Reg. 14,077, 14,078 (Dep't Commerce Mar. 12, 2021) (antidumping duty); Appx1210 (countervailing duty).

---

[1] For an overview of the "country-wide rate" applicable in non-market economy matters, such as those involving China, see *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1340–41 (CIT 2020).

## C

For its part, the Commission found "that imports subject to Commerce's affirmative critical circumstances determinations in the antidumping and countervailing duty investigations are likely to undermine seriously the remedial effect of the antidumping and countervailing duty orders." *Small Vertical Shaft Engines from China*, 86 Fed. Reg. 22,975, 22,975 n.2 (ITC Apr. 30, 2021).

In so doing, the Commission cited the statutory standard and explained that as to "the timing and volume of the imports," 19 U.S.C. §§ 1673d(b)(4)(A)(ii)(I) and 1671d(b)(4)(A)(ii)(I), its "practice is to consider[2] import quantities prior to the filing of the petition [that is, pre-petition import quantities] with those subsequent to the filing of the petition [post-petition quantities] using data on the record regarding those firms for which Commerce has made an affirmative critical circumstances determination." Appx3091. The Commission treated November 2019 through March 2020 as the "pre-petition period" and April through August 2020 as the "post-petition period." Appx3093.

The agency emphasized that there was a surge of imports during the summer of 2020, "an off-season portion of the year" during which imports do not normally increase. Appx3095. "These imports also in-

---

2 The court presumes the Commission intended this word to be "compare."

creased relative to apparent U.S. consumption at a
time when consumption was declining, and the vol-
umes associated with the increase were large . . . ."
Appx3095; Appx3099–3100 (same findings as to coun-
tervailing duty order).

The Commission rejected MTD's argument that
COVID-19 shutdowns artificially depressed pre-peti-
tion import volumes, citing data showing that Zong-
shen exported more small vertical shaft engines to the
United States in January–March 2020—the period for
which MTD cited COVID-related shutdowns—than it
did during the same period in 2019. Appx3096. The
agency also found that Zongshen's total imports in
June and July 2020 were not just higher than any
month during the pre-petition period—"they were the
largest monthly export volumes to the United States
from . . . Zongshen" over the entire period investigated.
Appx3096–3097; Appx3100 (same findings as to coun-
tervailing duty order).

Finally, the Commission concluded that the in-
creased imports created "a large stockpile of imports
prior to the imposition of provisional duties, at levels
that were higher than all U.S. importers' annual end-
of-year inventories from 2017 through 2019," and that
import prices bottomed out during the second and
third quarters of 2020. Appx3097. The result was that
U.S. purchasers had less need to buy small vertical
shaft engines from the domestic engine industry for
the 2021 season. Appx3101. "[W]e find that this mas-

sive surge of imports and rapid inventory buildup is likely to protract the adverse impact of the subject imports on the domestic industry and thereby undermine seriously the remedial effect of the countervailing duty order." *Id.*; Appx3097–3098 (same conclusion as to antidumping duty order).

### D

After the Commission issued its determination that imports threatened to undermine the remedial effects of the antidumping and countervailing duty orders, Commerce issued the orders at issue here. The Department imposed antidumping duties on "unliquidated entries of small vertical engines from China entered, or withdrawn from warehouse, for consumption on or after July 23, 2020," i.e., 90 days before Commerce's preliminary determination, as to entries from Zongshen and the China-wide entity. *Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof from the People's Republic of China: Antidumping and Countervailing Duty Orders*, 86 Fed. Reg. 23,675, 23,676 (Dep't Commerce May 4, 2021).

The countervailing duty portion similarly provided that as to entries from Chongqing Zongshen General Power Machine Co.—one of the Zongshen entities—countervailing duties would be assessed on "unliquidated entries of small vertical engines which are entered, or withdrawn from warehouse, for consumption on or after May 26, 2020," i.e., 90 days before Commerce's preliminary determination. *Id.* at 23,677.

### III

MTD sued to challenge the Commission's determination that the surge in imports threatened to undermine the orders' remedial effect. *See generally* ECF 4.[3] Briggs & Stratton intervened to defend the Commission's determination. ECF 19.

MTD filed the pending motion for judgment on the agency record. ECF 31 (motion); ECF 41 (brief). The government (ECF 39, confidential; ECF 40, public) and Briggs & Stratton (ECF 44) opposed; MTD replied (ECF 42, confidential; ECF 43, public). The court then heard argument.

### IV

MTD sues under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and 1516a(a)(2)(B)(i). The court has subject-matter jurisdiction via 28 U.S.C. § 1581(c).

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the

---

[3] MTD does not challenge the agencies' findings about dumping or countervailable subsidies. Nor does the company challenge either the dumping or subsidy margins or Commerce's critical circumstances determination.

administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

## V

MTD raises two theories to challenge the Commission's determination that the imports in question were likely to seriously undermine the remedial effect of the antidumping and countervailing duty orders. First, MTD asserts that the agency used faulty data. ECF 41, at 10–19. Second, the company quarrels with how the Commission weighed the data. *Id*. at 20–28.

## A

MTD contends that the Commission based its determination on (1) "export data subject to significant lead times," (2) "incongruous and inaccurate comparison periods," and (3) "artificial apparent increases in volume due in large part to the Covid-19 pandemic." *Id.* at 10. MTD also argues that in "any case," the

agency (4) "failed to sufficiently explain how these issues impacted the timing and volume of apparent imports, the first statutory criterion under the critical circumstances analysis." *Id*. at 11.

1

The court begins with MTD's fourth and final contention, which the company barely made in passing in its opening brief and then fully developed in its reply as a statutory argument. *Compare* ECF 41 (opening brief), at 11, *with* ECF 43 (reply), at 1–5. While ordinarily the court would decline to address an argument only pressed for the first time on reply, the government took the bait and joined the issue in its brief. ECF 40, at 46. Thus, the court will entertain MTD's late-blooming statutory argument.

MTD contends that the Commission's determination "must be based on . . . the information expressly required by the statute—*import* data. A finding based on anything else is inherently speculative, suspect, and unsustainable." ECF 43, at 3 (emphasis in original). As the government argues, however, the Act simply directs the Commission to "consider" the "factor" of the "timing and volume of imports" and does not restrict what *data* the Commission may consider in so doing. ECF 40, at 46 ("[I]t is reasonable to interpret this language as permitting the Commission to consider several key points along the timeline of an import—such as order date, shipment date, export date, date of importation, or delivery date—as would be

relevant under the circumstances of any particular investigation."); *see also* 19 U.S.C. §§ 1673d(b)(4)(A)(ii), 1671d(b)(4)(A)(ii). Nothing in the statute restricts the Commission's broad discretion to consider *data* reasonably relevant to determining the "timing and volume of imports." Reinforcing this discretion, the Act directs the agency to consider—"among other factors it considers relevant"—"*any other circumstances* indicating that the remedial effect of the [orders] will be seriously undermined." ECF 40, at 46 (emphasis and brackets the government's) (quoting 19 U.S.C. §§ 1671d(b)(4)(A)(ii)(III) and 1673d(b)(4)(A)(ii)(III)). The court therefore turns to whether the agency's reliance on the data in question was reasonable.

## 2

MTD argues that the Commission's use of Chinese export data "would not account for the demonstrated 90- to 120[-]day lead times applicable to exports of the subject merchandise." ECF 41, at 12. The company contends that the use of "export data which is subject to lead times of three-to-four months" could be "problematic" because portions of the export data would "likely reflect imports ultimately subject to provisional measures." *Id.* at 12–13. MTD also argues that engine shipments through July 2020 "reflected purchase commitments under contracts that had been inked in 2019, long before the filing of the Petition." ECF 43, at 9. It contends that the company "did not—and as a practical matter could not—both order and import such a massive quantity of engines" in the period after

Briggs & Stratton filed its petition but before the agencies' imposition of provisional measures. *Id.* at 9–10.

The government responds that the Commission took note that MTD itself "reported that lead times for imports in 2020 varied widely because of shipment disruptions related to COVID-19." ECF 40, at 34. It argues that because of such variations, "which covered most of the pre-petition period and all of the post-petition period, it was reasonable for the Commission to rely on export data, as export data was not as subject to variability in shipment times and, therefore, was a more comparable and reliable data source for evaluating the timing and volume of any post-petition increases." *Id.* at 34–35.

The administrative record shows that the agency responded to MTD's argument by calling it "inapposite": "Our critical circumstances data are based on monthly exports to the United States reported by [Zongshen], not on monthly U.S. imports, and therefore do not reflect shipment times from [Zongshen] . . . on which the estimated 90 to 120 day produced-to-order lead times are based." Appx2347 n.256. The Commission also noted that MTD acknowledged placing orders during the spring of 2020 after Briggs & Stratton filed its petition and that the imports resulting from those orders "began arriving in the United States in the May–June period and continued in July and August." Appx2347.

The agency thus considered MTD's arguments and gave a reasonable explanation for rejecting them based on the evidence in the record. Under the substantial evidence standard of review, that suffices. Although MTD asks the court to re-weigh the evidence, the standard of review does not allow the court to do so. *See Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1365 (Fed. Cir. 2019).

3

MTD argues that the comparison periods the Commission used were inappropriate. The company notes that Briggs & Stratton filed its petitions on March 18, 2020, and that the agency therefore included March in the "pre-petition period": "[T]he Commission used the entirety of volume data for the months November 2019–March 2020 as the 'pre-petition' period and that for April 2020–August 2020 as the 'post-petition' period. This resulted in 12 days' worth of data wrongly included in the 'pre-petition' comparison period, and 7 days incorrectly included in the 'post-petition' period." ECF 41, at 11.

The agency explained that it chose to place March 2020 in the pre-petition period "in light of the specific circumstances of these investigations," Appx2343, because Briggs & Stratton filed the petitions "towards the middle of the month," Appx2343 n.241. The Commission further explained that its choice of August 2020 for the end of the post-petition period was based

on Commerce issuing its preliminary determination in the countervailing duty investigation on August 24, 2020, "within the fifth month of the post-petition period we are using here." Appx2343 n.243. The Commission referred to its "practice" as being to use the same pre- and post-petition periods for both the antidumping and countervailing duty matters. *Id.*

The agency thus gave a reasonable explanation for its choice of pre- and post-petition periods. MTD admits that it is "unclear exactly how much of the volume data for each [of] these two months [i.e., March and August 2020] fall within these erroneously included periods." ECF 41, at 11–12. MTD's arguments about the time periods leading to erroneous results are therefore speculative.

4

Finally, MTD argues that the Commission wrongly based its determination partially on "artificial apparent increases in volume due in large part to the COVID-19 pandemic." *Id.* at 10. The company contends that the agency's finding that monthly exports of subject merchandise hit their highest levels of the period of investigation from April to July 2020—that is, during the "post-petition" analysis period—was inappropriate because of the combination of "lead times" and the ripple effect of COVID-related production shutdowns in China between January and March 2020. *Id.* at 14–15. "[I]t is likely that a substantial portion of the exports reflected in this period would have

been ordered prior to the filing of the petitions," *id.* at 15, and MTD contends that the surge in imports was caused by Chinese manufacturers' efforts to clear out a backlog of pending orders, *id.*

The Commission considered MTD's arguments and acknowledged that Zongshen was indeed affected by COVID-related shutdowns in January through March 2020, but the agency found that "those shutdowns did not appear to affect its exports to the United States" because those exports "were higher in January through March 2020 than during the same period in 2019. Thus, to the extent MTD's argument is that the increase in the post-petition period is to make up for exports delayed due to the COVID-19 pandemic, the record evidence on [Zongshen's] exports to the United States contradicts this argument." Appx2347 (footnote reference omitted). The Commission also noted that MTD acknowledged placing orders with Zongshen after the petition was filed and that those imports arrived in the U.S. during May through August 2020. *Id.*

The record shows that the Commission considered MTD's argument, weighed the evidence, and found that argument unconvincing. The agency's explanation is reasonable, and the court will not second-guess its findings.

B

Emphasizing the views of the Commissioner who partially dissented, *see* Appx2356 (Separate Views of

Commissioner David S. Johanson), MTD challenges the Commission's conclusion that imports before the imposition of provisional relief seriously undermined the remedial effect of the antidumping and counter-vailing duty orders. As the company observes, the Act's critical circumstances mechanism seeks to pre-vent accelerated imports from circumventing duty or-ders. ECF 41, at 20–21. MTD contends, however, that such is not the situation here because its imports con-sisted of "custom-made, non-fungible products" which were not stockpiled and thus were unavailable for such tactics. *Id.*

The government responds that the Commission found that Briggs & Stratton was able to produce, and did produce, small vertical shaft engines suitable for MTD's products. ECF 40, at 66 (citing Appx2313–2314). The government further observes that the Com-mission determined that even though MTD does not ordinarily resell small engines from its inventory, "the additional inventories of imported [small vertical shaft engines] nevertheless represented orders that the do-mestic industry did not have an opportunity to obtain." *Id.* (citing Appx2349, Appx2354). In that regard, the Commission also found that the inventory buildup as-sociated with the surge in imports meant there would be less need for power tool manufacturers to purchase small engines for the next year's season. Appx2349, Appx2353–2354.

The Commission also noted the unusual timing of the surge in imports (or Chinese exports) of subject merchandise during a time of year when such imports do not normally increase and at a time when U.S. consumption of subject merchandise was apparently declining. Appx2345–2346. The agency placed significance on (1) the surge in imports coinciding with the time of year when domestic purchasers would be negotiating prices for engines to be delivered during the next year's lawn mower season and (2) the imports arriving during the surge having among the lowest prices of any imports during the period of investigation. Appx2349. The Commission concluded that this combination of facts demonstrated that the surge of imports would "protract the adverse impact of the imports subject to the affirmative critical circumstances finding on the domestic industry and thereby undermine seriously the remedial effect of the antidumping order." *Id.*; *see also* Appx2353–2354 (same analysis for countervailing duty order).

MTD, however, argues that later events show that "the remedial effects of the Orders were not, in fact, seriously undermined by the apparent increase in imports over the post-petition period." ECF 41, at 22; *see also* ECF 43, at 17 ("The remedial effects of the orders were not seriously undermined") (point heading), 18 ("MTD submits that . . . the record evidence demonstrates that the remedial effect of the Orders was not undermined, seriously or otherwise.").

The statute, however, requires the Commission to assess whether subject imports "*are likely* to undermine seriously the remedial effect[s]" of the antidumping and countervailing duty orders "*to be issued*." 19 U.S.C. §§ 1673d(b)(4)(A)(i) (emphasis added), 1671d(b)(4)(A)(i) (same). In other words, the Commission makes an informed judgment *in advance*. The court need not decide whether the import surge *did*, in fact, seriously undermine the orders' remedial effects because even if it did not, that fact would not invalidate the Commission's finding under the statute.

The Commission amply explained the reasons for its conclusion that a surge in subject imports threatened to seriously undermine the duty orders' remedial effects. And although MTD disputes the evidentiary sufficiency of those findings, and urges the court to adopt the dissenting views of Commissioner Johanson, substantial evidence review does not permit the court to re-weigh the evidence as MTD proposes. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1372 (Fed. Cir. 2015) (cleaned up) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Although the court agrees with MTD that the conclusion drawn by Commissioner Johanson is supported by the record, the conclusion drawn by the Commission majority—considering the record as a whole and the evidence that detracts from

that conclusion—is also supported by the record. Under the substantial evidence standard, ties go to the agency.

*   *   *

For all these reasons, the court denies MTD's motion for judgment on the agency record and grants judgment on the agency record to the government and Briggs & Stratton. *See* USCIT R. 56.2(b). A separate judgment will issue. *See* USCIT R. 58(a).

Dated:   March 16, 2023            /s/ *M. Miller Baker*
         New York, New York        Judge